UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENIS CHAVEZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELADON GROUP, INC., BOBBY L. PEAVLER, and PAUL A. WILL,<br><br>Defendants. | No. 17 Civ. 2828<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Denis Chavez ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Celadon Group, Inc. ("CGI" or the "Company") common stock between December 30, 2016 through April 18, 2017 inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2. CGI, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services.

3. On April 5, 2017, the market research website *Seeking Alpha* published a detailed report authored by a prominent market research group, entitled "Celadon Group: A Story That Ends At Chapter 11," which, among other things, alleged that "CGI has used …. manipulative accounting practices to hide its insolvent condition from investors and creditors."

4. On this news, CGI's share price fell nearly 14% to close at $5.40 on April 5, 2017.

5. On April 19, 2017, the same prominent market research group published another report entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about CGI sought under the Freedom of Information Act ("FOIA") due to an ongoing SEC investigation.

6. On this news, CGI's share price fell 13% to an intra-day price of $3.85 per share at approximately 1 pm on April 19, 2017.

7. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) CGI's equity contribution to its joint venture with Element Financial Corp. was $68.2 million, rather than the $100 million contribution the Company reported in its public filings; (ii) the Company is being actively investigated by the SEC; and (iii) that as a result of the foregoing, CGI's publicly disseminated financial statements were materially false and misleading.

## JURISDICTION AND VENUE

8. The federal law claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, as well as under the common law.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

10. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company's common stock trades on the New York Stock Exchange.

12. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13. Plaintiff Denis Chavez was a shareholder of CGI during the Class Period. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

14. Defendant Celadon Group, Inc. is a Delaware corporation with its principal place executive offices located at 9503 East 33rd Street, One Celadon Drive, Indianapolis, Indiana. CGI,

through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services. The Company trades on the New York Stock Exchange under the ticker symbol "CGI."

15. Defendant Bobby L. Peavler ("Peavler") has served at all relevant times as CGI's Chief Financial Officer, Executive Vice President, and Treasurer.

16. Defendant Paul A. Will ("Will") has served at all relevant times as CGI's Chief Executive Officer.

17. Collectively, Peavler and Will are referred to throughout this complaint as the "Individual Defendants."

18. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## BACKGROUND

19. CGI operates through various subsidiaries, including Quality Companies, LLC, Quality Equipment Leasing, LLC (the "Quality Companies") which together offer lease purchase programs for tractors, used trailer sales, and new equipment leasing for fleets.

20. In March of 2014, CGI entered into a transaction with non-CGI entity, Element Financial Corp. ("Element"), under which Element purchased CGI's portfolio of independent contractor leases (which included leasing a tractor from CGI through the Quality Companies) and directly provided financing to CGI's independent contractors. The portfolio was held in CGI's Quality Companies business unit.

21. Under CGI's agreement with Element, CGI was required to service the equipment lease and other financing arrangements between independent contractor drivers and Element, which includes collecting payments from the independent contractors and remitting those payments to Element.

22. The agreement also included an arrangement under which CGI was obligated to advance to Element any shortfall between the required lease payments and the maintenance advances and amounts actually collected from the independent contractors (the "Lease Shortfall Advances").

23. Element was obliged to reimburse CGI for the Lease Shortfall Advances when they disposed of the entire tranche of tractors to which the shortfall related.

24. In CGI's full year 2016 financial report, filed on Form 10-K with the SEC on September 13, 2016, the Company explained that the "demand for trucking services and the market for used tractors have both weakened" and that "[t]hese factors have depressed Quality's earnings and created negative cash flows associated with our obligation to advance certain amounts to

[Element].” Put simply, CGI was hemhorraghing money as a result of its Lease Shortfall Advance obligations.

25. In the same 10-K filing, the Company announced that it had signed an MOU with Element “under which substantially all of Quality’s tractors under management owned by such third party financing provider, 19th Capital [which in 2015 purchased a portfolio of the Quality Companies’ independent contractor leases], and Quality would be combined into 19th Capital as a joint venture” (the “Joint Venture”). The Company further explained that existing agreements with Element would be terminated and replaced with definitive agreements contemplated by the MOU.

## SUBSTANTIVE ALLEGATIONS

### *A. Materially False And Misleading Statements Made During the Class Period*

26. The Class Period begins on December 30, 2016. On that day, CGI issued a press release entitled “Celadon Group Announces Closing of Joint Venture with Element Fleet Management,” in which CGI, among other things, touted its $100 million investment in its newly-created joint venture with Element. The press release stated, in pertinent part:

> INDIANAPOLIS, Dec. 30, 2016 /PRNewswire/ -- Celadon Group, Inc. (NYSE: CGI) (“Celadon”) announced today that it has entered into a joint venture agreement with Element Transportation LLC (“Element”), a subsidiary of Element Fleet Management (TSX: EFN). The joint venture will hold leasing assets managed by Celadon’s Quality Companies, LLC business unit (“Quality”) and formerly held by a combination of Celadon (including, Element, and 19th Capital Group, LLC (“19th Capital”), a Delaware limited liability company.
>
> **Company Statement**
>
> Chairman and Chief Executive Officer Paul Will commented: “We are very pleased to announce the closing of our previously announced joint venture transaction with Element. Since August, we have been working diligently with the Element team to structure a high quality, well-capitalized business that will provide excellent transportation assets and high quality service to our customers. With the interests and investments of Element and Celadon strongly aligned, an experienced management team, and the resources to optimize leasing assets, the joint venture

has the components for success. The support and business acumen of the Element team were instrumental to the process, and we appreciate their partnership.

"In addition to capitalizing a strong joint venture, the transactions furthered Celadon's goals of exiting the capital intensive component of the leasing business, reducing balance sheet debt, and converting our Quality Companies unit primarily to an asset light business. We believe the transaction has multiple benefits for our stockholders and are excited to be able to focus our resources on the trucking side of the business."

"We have built a long-term relationship with Celadon, and we are excited to deepen our partnership," stated Bradley Nullmeyer, Chief Executive Officer of Element. "This joint venture expands Element's position in the Class 8 tractor sector and provides a great opportunity to broaden our range of fleet services across a larger market, with a great partner."

**About the Joint Venture**

The joint venture represents the combination of the former equipment leasing portfolios of Celadon, Element, and 19th Capital that were managed by Quality. The joint venture holds over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets. The joint venture is considered to be one of the leading lessors to this market, with an augmented and experienced management team that is focused on driving excellence throughout the business.

The joint venture was formed through recapitalizing 19th Capital. The former owners of 19th Capital (including Celadon's former Class A and Class B interests) were redeemed using pre-transaction cash of 19th Capital, and new equity was contributed by Celadon and Element to establish the post-transaction capitalization. Celadon's contribution includes cash and lease equipment totaling $100 million in value in exchange for its equity in the joint venture. The cash component was more than offset by proceeds of redemption, settlement of the deferred purchase price on assets sold to 19th Capital in FY2016, and collection of an amount relating to the terminated pre-joint venture arrangements. After the contributions, each of Celadon and Element own approximately 49.99% of the joint venture's equity, with employees of 19th Capital holding the remainder.

As part of the transaction, all previous agreements between Celadon, Element, 19th Capital, and their respective affiliates, have been terminated or assumed by the joint venture with no liability of Celadon. Quality has entered into a new Service Agreement with the joint venture and will provide leasing management services in exchange for a monthly fee per tractor.

> **Additional Information**
>
> In addition to closing the joint venture, Celadon received approximately $50 million in cash proceeds from the sale of equipment associated with the Quality business at net book value for use by the joint venture. This sale and the equity contribution of equipment substantially reduced the Company's equipment held for sale, leased assets held for sale, and leased assets.
> The Company will file a Form 8-K containing additional information within the required timeframe.

27. On January 6, 2017, the Company filed a Form 8-K with the SEC further detailing the Joint Venture and its contributions thereto, including that the company had contributed a $31.8 million cash reimbursement of Lease Shortfall Advances received from Element, among other things:

> - The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used with a net book value of $63.6 million, and (iii) received credit for $1.1 million of unencumbered cash in the bank accounts of 19th Capital immediately at the consummation of the Transaction. In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital, (ii) paid to the Company $31.8 million in cash for reimbursement of previous payments made by the Company related to the Element assets, and (iii) issued the Company an obligation to distribute restricted cash of 19th Capital and its subsidiaries at the closing of the Transactions of approximately $2.5 million at such time as such cash becomes unrestricted. Going forward, the Company has agreed not to enter into additional leases as lessor in the equipment leasing business, subject to a modest exception for short-term leasing pending ordinary course dispositions from the Company's trucking fleet.
>
> ****
>
> **<u>Summary of Cash Sources and Uses</u>**
>
> The following table summarizes the Company's primary sources and uses of cash associated with the Transactions (excluding taxes, fees, and expenses):

| | Source / (Use) (in millions) | Description |
|---|---|---|
| $ | 4,600 | Cash received – redemption |
| | 6,700 | Cash received – receipt of deferred purchase price cash |
| | 50,000 | Cash received – sale of Quality equipment |
| | 31,800 | Cash received – reimbursement of Other Assets |
| | (35,300) | Cash invested in 19th Capital at closing |
| $ | 57,800 | Net cash received at closing |

The foregoing excludes other sources and uses of cash during the quarter and should not be considered a substitute for the Company's net changes in cash during the quarter.

**Summary of Equipment Transactions**

The following table summarizes the Company's total contribution to 19th Capital at closing, including equipment dispositions associated with the Transactions:

| | Source / (Use) (in millions) | Description |
|---|---|---|
| $ | 56,000 | Equipment contributed to 19th Capital at closing |
| | 21,900 | Contribution of deferred sale assets from 9/30/2016 |
| | 50,000 | Equipment sold to Element at closing |
| | 34,600 | Settlement of deferred sale assets from 6/30/2016 |
| $ | 162,500 | Total equipment reduction at closing |
| | | |
| $ | 14,300 | Contribution of deferred sale liability from 9/30/2016 |
| | 26,000 | Settlement of deferred sale liability from 6/30/2016 |
| $ | 40,300 | Total reduction in liabilities at closing |
| | | |
| $ | 77,900 | Equipment contributed to 19th Capital at closing |
| | (14,300) | Other liabilities related to contributed deferred sales assets |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Undistributed cash remaining with 19th Capital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

28. On February 10, 2017, CGI filed with the SEC its Quarterly Report on Form 10-Q for the three month period ended December 31, 2016, prominently touting the Company's

collection of $31.8 million in Lease Shortfall Advances from Element and in-turn contribution of that money to the Joint Venture:

> **Non-Controlling Investment**
>
> In December 2016, the Company, Quality Companies LLC, a wholly-owned subsidiary of the Company ("Quality"), Quality Equipment Leasing, LLC, a wholly-owned subsidiary of the Company ("Leasing"), 19th Capital Group, LLC, a non-controlling investment of the Company before and after the transactions described below ("19th Capital"), Element Transportation LLC ("Element"), and certain other parties entered into a series of simultaneous agreements and related transactions (collectively, the "Transactions"), pursuant to which substantially all tractors under management by Quality and owned by Element, 19th Capital, Quality, and Leasing have been combined into 19th Capital as a joint venture primarily between the Company and Element. After the Transactions, the Company and Element each own a non-controlling approximately 49.99% interest in 19th Capital, which at December 31, 2016, held the rights to over 10,000 tractors for use in leasing operations. The Company recorded $100.0 million as a minority investment and will record operating results of the joint venture using the equity method of accounting. The Transactions included the following:
>
> - *Redemption of Existing Members*: 19th Capital redeemed all of its issued and outstanding membership interests, including those owned by the Company, for $15.7 million in cash. The Company's proceeds from the redemption were approximately $4.6 million in cash. The proceeds received relate primarily to the original $2.0 million that had been invested by the Company in 2015 and its proportionate share of undistributed earnings from inception. The Company recorded a net gain on the redemption of approximately $0.3 million, reflecting the excess of redemption proceeds over the initial investment plus equity income profits previously recognized. In addition to the redemption amount, the Company is entitled to receive approximately $2.5 million in restricted cash when the restrictions lapse. The Company has evaluated this receivable under ASC 450 – Contingencies and has not recorded a receivable within our financial statements at this time. If and when collected, this amount would be recorded as income.
>
> - *Deferred Sale with 19th Capital*: As part of the Transactions the Company received proceeds of $6.7 million in payment of deferred purchase price from a sale of equipment to 19th Capital in the June 30, 2016 quarter. This collection triggered sales accounting treatment for leased assets where recognition of the sale was deferred and leased assets remained on the Company's balance sheet. As a result, the Company removed $34.6 million of "Leased assets" and $26.0 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". The Company did not recognize any gain or loss with this transaction.

- *Sale to Element*: The Company sold tractors and trailers and assigned the related leases to Element for approximately $50.0 million. There was no material gain or loss on the disposition of this equipment.

- ***Receipt of Lease Servicing Advance ("Perfect Pay")*****: The Company received $31.8 million in cash related to a receivable from Element related to the Company's Perfect Pay obligations under the prior service agreements with Element.**

- *Contribution by the Company*: The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used, with a net book value of $56.0 million, (iii) received credit for $1.1 million of amounts owed to the Company by 19th Capital and (iv) contributed $7.6 million of the remaining consideration due from 19th Capital related to a September 30, 2016 deferred sale transaction with 19th Capital that was previously recorded as a financing transaction under GAAP. The contribution of the $7.6 million resulted in the removal of "Leased assets" of $21.9 million and $14.3 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital.

- *Summary of Transactions*: The following table summarizes the Company's total contribution to 19th Capital at closing (in thousands):

| Contribution | | Description |
|---|---|---|
| $ | 56,000 | Equipment contributed to 19th Capital at closing |
| | 7,600 | Contribution of deferred sale receivable |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Receivable due from 19th Capital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

****

**Cash Flows**

**Net cash provided by operations for the six months ended December 31, 2016 was $58.5 million, compared to $22.9 million for the six months ended December 31, 2015. The increase reflected several items related to the closing of our joint venture in December 2016 and related equipment transactions during the period. These items include, $31.8 million in collection of cash payment recorded under other assets**, distributions received on earnings from an unconsolidated entity of $2.6 million, and a $16.9 million reduction in leased

> revenue equipment held for sale. Excluding these amounts, net cash flow provided by operations was $7.2 million for the six months ended December 31, 2016. Leased revenue equipment held for sale reflects $82.1 million of sales less $65.2 million of purchases for the six months ended December 31, 2016. These purchases relate solely to equipment for the benefit of our equipment leasing and services segment which activities will be undertaken through 19th Capital moving forward. Leased revenue equipment held for sale was zero at December 31, 2016. Purchases and sales of used Celadon fleet equipment are included within our net cash provided by investing activities.

(emphasis added).

29. The Company's February 10, 2017 Form 10-Q

30. The Company's February 10, 2017 Form 10-Q was signed by Defendants Zyskind and Pipoly and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, who each certified:

> 1. I have reviewed this Form 10-Q of Celadon Group, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our

supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31. On May 11, 2015, the Company filed with the SEC its Quarterly Report on Form 10-Q for the three month period ended March 31, 2015, providing the Company's consolidated financial results for that period summarized in the Company's May 5, 2015 press release.

32. The Company's February 10, 2017 Form 10-Q also assured investors of the effectiveness of the Company's internal control over financial reporting:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is

recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

## B. ***The Truth Begins To Emerge – Disclosures At The End Of The Class Period***

33. On April 5, 2017, the market research website *Seeking Alpha* published a detailed report authored by Prescience Point Research Group ("Prescience Point"), alleging that the Company overstated its investment in the Joint Venture by $31.8 million, providing, in pertinent part:

**CGI Lied RE Collecting on its $31.8m Shortfall Receivable. Is this the Smoking Gun that it's Falsifying its Financials?**

Given that the Lease Shortfall Advances were a significant reason that cash flow had turned negative, investors were obviously concerned about these payments. CGI had highlighted that its JV arrangement would not require continued Lease Shortfall Advances.[3] 8-K from 01/06/2017: "The new Service Agreement does not contain any payment remitting, "Perfect Pay" or similar obligation"

Furthermore, CGI prominently highlighted in its Q2'17 earnings release filed on 2/01/2017 that it collected $31.8m of prior Lease Shortfall Advances from Element. Unfortunately, based on information provided in the JV subscription agreement, it appears that **CGI never actually collected its Lease Shortfall Advances. CGI received a sham daylight loan from the JV:** In the subscription agreement, CGI disclosed that Element provided a "daylight loan" of $31.8m to the JV, the JV then gave the $31.8m to CGI, and then CGI paid the $31.8m back to the JV to pay off the outstanding contribution from Element. What essentially happened is Element

gave CGI $31.8m and then CGI handed that $31.8m right back to Element (with the JV as an intermediary). The circular transaction created the illusion that CGI collected it Lease Shortfall Advances and made a $31.8m contribution to the JV, but this is just accounting gimmicks. No value was ever created or contributed to the JV.




The specific details of the Lease Shortfall Advance and related daylight loans are detailed below.

**Element required to repay the Lease Shortfall Advances:** CGI was obligated to provide lease shortfall payments to Element on an ongoing basis. By the end of Q1'17, CGI had made $31.9m in payments to Element. These payments were capitalized (i.e. not expensed) on CGI balance sheet as "Lease Shortfall Advances" within Other Assets. In its Q1'17 10-Q, CGI noted that Element was obligated to reimburse it for these payments:

"The financing provider is required to reimburse us for these advances and, accordingly, **we have accounted for the related receivable under other assets** on our consolidated balance sheet, in the amount of **$31.9 million** as of September 30, 2016, and June 30, 2016."

**CGI claims it collected its Lease Shortfall Advances from Element:** In its 8-K filed on 1/6/2017, CGI claimed its $31.9m lease shortfall receivable had been almost completely reimbursed by Element as part of the JV closing:

**Net Cash Received from the JV Closing**

| *($ millions)* | Q2' 17 |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in JV at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**As disclosed in the subscription agreement, Element loaned money to CGI:** We believe the JV subscription agreement indicates that no collection occurred.

Specifically, the subscription agreement details that Element provides a $31.8m "daylight loan" to the JV (i.e. "the Company" below), and then the JV would give the $31.8m received from Element to CGI.

*At the closing of the Element Investment,*

*((i)) Element shall transfer, convey, and assign to the Company the Element Assets;*

*(ii) Element shall make a loan to the Company in the principal amount of $31,800,000 (the "Element daylight loan"), which shall be evidenced by this Agreement, and the Company shall pay $31,800,000 to Celadon in respect of the Payment; (Subscription Agreement, 02/10/17)*

**As also disclosed in the subscription agreement, CGI immediately paid back the loan to Element:** The subscription agreement further details that (1) CGI will transfer the cash to the JV (i.e. "the Company" below) and the JV would repay the loan from Element. Thus, CGI gave the cash it received from the daylight loan right back to Element at the JV closing. This, in our opinion, proves without a shadow of a doubt that CGI created a gimmick loan to fool investors into believing that it collected its outstanding Lease Shortfall Advances.

*At the closing of the Celadon Investment,*

*((i)) Celadon shall transfer, sell, and assign all of its interests in the Quality Assets to the Company;*

*(ii) Celadon shall transfer $31,800,000 in cash to an account designated by the Company, and the Company shall repay the Element Daylight Loan in full; (Subscription Agreement, 02/10/17)*

(emphasis in original).

34. On April 19, 2017, Prescience Point published another article, which was featured on *Seeking Alpha*, entitled " entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about CGI sought under the Freedom of Information Act ("FOIA") due to an ongoing SEC investigation. The report provided, in pertinent part:

## <u>CGI is Being Investigated by the SEC Enforcement Division</u>

We received data in response to our Freedom of Information Act ("FOIA") requests that confirms CGI is the subject of an active SEC investigation. CGI has <u>failed to disclose</u> these proceedings.

In a letter dated March 3, 2017, the FOIA office denied our request for access to CGI's investigative records by invoking Exemption (b)(7)(A) of the FOIA. Citation of the (b)(7)(A) exemption means that the SEC deems the release of information it has collected on CGI could be expected to interfere with law enforcement proceedings.

- An excerpt from the first page of the FOIA office's response letter is provided below:

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

March 3, 2017

[redacted]

Re: Freedom of Information Act (FOIA), 5 U.S.C. § 552
Request No. 17-01684-FOIA

Dear [redacted]

This letter is in response to your request, dated January 31, 2017 and received in this office on February 8, 2017, for access to the main investigative file for Celadon Group, Inc., since January 1, 2013. Specifically, you listed six types of records for which you were interested, as well as information regarding confidential treatment requests.

We are withholding records that may be responsive to your request under 5 U.S.C. § 552(b)(7)(A), 17 CFR § 200.80(b)(7)(i). This exemption protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities. Since Exemption 7(A) protects the records from disclosure, we have not determined if other exemptions apply. Therefore, we reserve the right to assert other exemptions when Exemption 7(A) no longer applies.

- Again, by invoking Exemption (b)(7)(A), the SEC has acknowledged that CGI is the subject of an ongoing SEC investigation. Per the Department of Justice,

  > *The first subpart of Exemption 7 of the Freedom of Information Act, Exemption 7, authorizes the withholding of 'records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings.'*

- For further confirmation of the existence of an investigation, we sent an administrative appeal to the General Counsel's office. In its response, the General Counsel's office denied our access to CGI's records by once again invoking Exemption (b)(7)(A), stating that releasing investigative records on CGI could "interfere with ongoing enforcement proceedings." By doing so, the General Counsel's office has confirmed that CGI is the subject of an active SEC investigation. An excerpt from the first page of the General Counsel's response letter is provided below:

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Stop 9612

March 13, 2017

[redacted]

Re: Appeal, Freedom of Information Act Request No. 17-01684-FOIA, designated on appeal as No. 17-00271-APPS

Dear [redacted]

This responds to your Freedom of Information Act (FOIA) appeal of the FOIA Officer's denial of your January 31, 2017 FOIA request for certain investigative records concerning Celadon Group, Inc. that the Commission has obtained or generated since January 1, 2013. By letter dated March 3, 2017, the FOIA Officer denied your request pursuant to FOIA Exemption (b)(7)(A). On March 9, 2017, you filed this appeal challenging the FOIA Officer's invocation of Exemption 7(A). I have considered your appeal and it is denied.

I have determined that the FOIA Officer correctly asserted Exemption 7(A).[1] There is a two-step test to determine whether information is protected under Exemption 7(A), whether: (1) a law enforcement proceeding is pending or prospective, and (2) release of information about it could reasonably be expected to cause some articulable harm.[2] We have confirmed with staff that releasing the withheld information could reasonably be expected to interfere with ongoing enforcement proceedings.[3]

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired CGI securities between December 31, 2016 through April 18, 2017, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CGI securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of November 14, 2016, the Company had 170,450,763 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by CGI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether the Exchange Act was violated by Defendants;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether the price of the Company's stock was artificially inflated; and

f. The extent of damage sustained by Class members and the appropriate measure of damages.

38. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

39. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

40. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

41. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42. During the Class Period, Plaintiff and the Class purchased CGI securities at artificially inflated prices and were damaged thereby.

43. On April 5, 2017, a report published on the investor website *Seeking Alpha* entitled "Celadon Group: A Story that Ends At Chapter 11," detailed the "smoking gun" showing that CGI had falsified its financial statements and represented to shareholders that its investment in the Joint

Venture was $100 million when, in fact, it was only $68.2 million due to a sham "daylight loan" the Company counted as a cash contribution to the Joint Venture.

44. On this news, shares of CGI fell from $6.25, the closing price on April 4, 2017, to close at $5.40 on April 5, 2017, representing a 13.63% decline in the value of the Company's common stock.

45. This decline is directly attributable to the April 5, 2017 article published by Prescience Point and featured on *Seeking Alpha* entitled "Celadon Group: A Story that Ends At Chapter 11," which detailed that a sham loan was counted by CGI, and reported to shareholders, as a capital contribution to the Joint Venture.

46. On April 19, 2017, the same prominent market research group published another report entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about CGI sought pursuant to the FOIA due to an ongoing SEC investigation.

47. On this news, CGI's share price fell CGI fell from $4.40, the closing price on April 18, 2017, to an intra-day price of $3.85 per share at approximately 1 pm on April 19, 2017, representing a 13% decline in the value of the Company's common stock.

48. This decline is directly attributable to the April 19, 2017 article published by Prescience Point and featured on *Seeking Alpha* entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," claiming that the SEC is actively investigating CGI.

## SCIENTER ALLEGATIONS

49. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CGI, his/her control over, and/or receipt and/or modification of CGI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CGI, participated in the fraudulent scheme alleged herein.

## FRAUD ON THE MARKET

50. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

51. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

52. The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

53. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

54. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii)

engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

57. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation of §20(a) of the Exchange Act (Against the Individual Defendants)

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59. The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

60. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61. As set forth above, CGI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: April 19, 2017

**GARDY & NOTIS, LLP**

By: s/ James S. Notis
James S. Notis
Jennifer Sarnelli
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508
jnotis@gardylaw.com
jsarnelli@gardylaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Bradley J. Vettraino
155 Federal Street, Suite 400
Boston, MA 02110
Tel: 617-398-5600
Fax: 617-507-6020
Jeff@blockesq.com
Bradley@blockesq.com

*Counsel for Plaintiff*