**LABATON SUCHAROW LLP**
Carol C. Villegas
Alec T. Coquin
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
acoquin@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*

**BLOCK & LEVITON LLP**
Jason Leviton
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Email: jason@blockesq.com

*Additional Counsel for Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CELADON GROUP, INC. SECURITIES LITIGATION | No. 17-cv-2828-JFK<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Lead Plaintiffs ..... 6

B. Defendants ..... 6

C. Additional Corporate Entities Relevant to the Case ..... 9

1. Quality Companies ..... 9

2. Element Financial Corp. ..... 10

3. 19th Capital I ..... 10

4. 19th Capital II ..... 11

IV. SUBSTANTIVE ALLEGATIONS ..... 11

A. CGI Business Overview ..... 11

B. The Rapid Rise of Quality ..... 13

C. Analysts Questions Quality's Sustainability ..... 20

D. 19th Capital I: CGI Moves Assets Off Balance Sheet to Enrich its Management and Reduce Debt ..... 22

V. Materially False And Misleading Statements Made During the Class Period ..... 51

A. The False Statements Had a Material Impact on Celadon's Financial Statements ..... 90

B. Defendants Knew or Recklessly Disregarded Celadon's Deficient Internal Controls ..... 93

VI. CLASS ACTION ALLEGATIONS ..... 98

VII. LOSS CAUSATION ..... 100

VIII. FRAUD ON THE MARKET ..... 103

IX. NO SAFE HARBOR ..... 104

X. CAUSES OF ACTION ........ 104

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants) ........ 104

COUNT II Violation of § 20(a) of the Exchange Act (Against the Individual Defendants) ........ 105

XI. PRAYER FOR RELIEF ........ 106

XII. DEMAND FOR JURY TRIAL ........ 106

Greater Pennsylvania Carpenters' Pension Fund and Arkansas Teacher Retirement System (together, "Lead Plaintiffs"), individually and on behalf of all other persons and entities who purchased or acquired Celadon Group, Inc. ("CGI" or the "Company") common stock during the period between October 29, 2013 through April 13, 2018, inclusive, (the "Class Period"), and who were damaged thereby (the "Class," as further defined below), allege the following based upon personal knowledge as to their own acts, and upon information and belief as to all other matters.

Lead Plaintiffs' allegations are based on counsel's investigation, which included, among other things: a review and analysis of CGI's public filings with the U.S. Securities and Exchange Commission ("SEC") and other public documents, including regulatory filings and reports in the United States, Defendants' press releases, analyst reports, and conference calls with analysts, and pleadings in other litigations; a review and analysis of news articles and other media coverage pertaining to CGI and its senior officers and directors, including the Defendants named and defined herein; and review of press releases, presentations, and filings with foreign regulators by Element Financial. Many of the facts supporting Lead Plaintiffs' allegations are known only by Defendants or are exclusively within their custody and/or control. Lead Plaintiffs believe that substantial further evidentiary support will be revealed after a reasonable opportunity to obtain discovery.[1]

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Celadon Group, Inc. ("CGI" or the "Company") common stock

[1] Lead Plaintiffs are filing this Consolidated Class Action Complaint in connection with a proposed settlement of the action. In the event that the Court declines to approve the settlement, the parties will revert to their litigation positions as of August 9, 2018. *See* ECF No. 51.

between October 29, 2013 through April 13, 2018 inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. CGI, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services.

3. This case concerns an accounting fraud by Celadon and certain of its executive officers that concealed from investors the Company's massive liabilities and deteriorating financial condition throughout the Class Period. Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) CGI did not appropriately recognize revenue equipment held for sale in its financial reports; (ii) CGI's equity contribution to its joint venture with Element Financial Corp. was $68.2 million, rather than the $100 million contribution the Company reported in its public filings; (iii) CGI's equipment transactions with Element and 19th Capital did not sufficiently transfer the risks of ownership to qualify for sales accounting; (iv) CGI improperly classified equipment leases as operating leases when they should have been listed as capitalized leases; (v) CGI failed to maintain effective internal controls over financial reporting; (vi) the Company is being actively investigated by the SEC and DOJ; and (vii) that as a result of the foregoing, CGI's publicly disseminated financial statements were materially false and misleading.

4. On October 12, 2016, the market research website *Seeking Alpha* published a detailed report titled "Celadon Group: SEC Inquiries, Accounting Issues And Liquidity Constraints Point To 65% Near-Term Downside." The *Seeking Alpha* article identified major accounting irregularities related to CGI's lease payment obligations and reserve liabilities.

5. On this news, CGI's share price fell nearly 10% on unusually heavy volume, to close at $7.80.

6. On April 5, 2017, *Seeking Alpha* published another detailed report authored by a Prescience Point Research Group ("Prescience Point"), entitled "Celadon Group: A Story That Ends At Chapter 11," which, among other things, alleged that "CGI has used …. manipulative accounting practices to hide its insolvent condition from investors and creditors."

7. On this news, CGI's share price fell nearly 14% on unusually heavy volume to close at $5.40.

8. On May 1, 2017, after trading had closed, CGI disclosed that its auditor had notified the Company that it was "withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon" due to issues relating to transactions involving "revenue equipment held for sale."

9. On this news, CGI's shares plunged another 55% on massive trading volume to close at $1.80 on May 2, 2017.

10. On May 3, 2017, CGI held a business call update during which management provided additional details on the ongoing audit review and restatement of the Company's financials, as well as an outlook on future performance. During the call, Defendant Peavler noted that "[t]he review of the revenue equipment transactions was initiated by the Audit Committee to

confirm and ensure proper accounting related to the preparation for, and formation of, the joint venture."

11. On October 2, 2017, CGI issued a Press Release in which it informed investors that the SEC had undertaken a formal investigation into the Company, that it had received a subpoena from the SEC and was in the process of producing documents to the SEC pursuant to that subpoena. CGI also noted that it did not expect to issue audited financial statements or report financial results in compliance with GAAP for Fiscal 2016, or any subsequent period, before December 31, 2017.

12. On this news, CGI stock plummeted more than 11% to close at $6.00.

13. On April 2, 2018, CGI disclosed that its internal investigation had "identified errors that will require adjustments to the previously issued 2014, 2015, 2016, and 2017 financial statements (and potentially periods prior thereto)" and that the adjustments are expected "to have a material impact on assets, liabilities, income (loss), and individual expense items in certain periods."

14. On this news, CGI's stock cratered more than 60% on unusually heavy trading to close at $1.35 on April 4, 2018.[2]

15. On April 13, 2018, CGI confirmed that it had received a delisting notice from the New York Stock Exchange indicating that the exchange had suspended trading prior to market open on April 3, 2018, and would be commencing procedures to delist the Company's stock because of CGI's inability to become current with its Securities and Exchange Commission reporting obligations. On this news, CGI's stock fell more than 8.7% to close at $1.35 on April 16, 2018.

[2] The NYSE suspended trading in Celadon stock prior to the market opening on April 3, 2018. Trading resumed on the over-the-counter market on April 4, 2018.

16. Celadon does not anticipate being able to issue restated financial reports for the affected periods until the end of 2018 or early 2019.

## II. JURISDICTION AND VENUE

17. Lead Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

18. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

19. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), (c), and (d), as the Company's common stock traded on the New York Stock Exchange throughout the class period.[3] Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

---

[3] The NYSE suspended trading in Celadon stock on April 3, 2018. The Company's stock now trades on the over-the-counter market.

## III. PARTIES

### A. Lead Plaintiffs

21. On August 22, 2017, this Court appointed Greater Pennsylvania Carpenters' Pension Fund and Arkansas Teacher Retirement System to serve as Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

22. Greater Pennsylvania Carpenters' Pension Fund ("Greater Pennsylvania") is a trustee-administered, multi-employer, defined benefit pension plan for carpenters in Pennsylvania that had more than $1.1 billion in net assets held in trust for pension benefits and includes more than 16,092 members as of July 30, 2018. As set forth in Exhibit 1 attached hereto, Greater Pennsylvania purchased CGI common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

23. Arkansas Teacher Retirement System ("Arkansas Teacher") is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related employees in the State of Arkansas. Arkansas Teacher was established by Act 266 of 1937, as an Office of Arkansas State government, for the purpose of providing retirement benefits for employees of any school or other educational agency participating in the system. Arkansas Teacher has more than $16.1 billion in net assets held in trust for pension benefits and includes more than 113,000 members as of August 2, 2018. As set forth in Exhibit 2 attached hereto, Arkansas Teacher purchased CGI common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B. Defendants

24. Defendant Celadon Group, Inc. is a Delaware corporation with its executive offices located at 9503 East 33rd Street, 1 Celadon Drive, Indianapolis, Indiana. CGI, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada,

and Mexico. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services. The Company provides tractor leasing and associated services through its Quality Companies business unit. The Company traded on the New York Stock Exchange under the ticker symbol "CGI" until April 18, 2018, when the NYSE delisted the stock. The Company's shares now trade on the OTC Markets.

25. Defendant Bobby L. Peavler ("Peavler") has served at all relevant times as CGI's Chief Financial Officer, Executive Vice President, and Treasurer. As the Company's CFO, Peavler disseminated false and misleading information to investors during the Class Period on earnings calls, and signed and certified several of CGI's false and misleading SEC filings and Company filings, as required by the Sarbanes-Oxley Act of 2002, P.L. 107-204, regarding the evaluation of internal controls over financial reporting and fraud detection ("SOX Certifications"). On October 16, 2017, in a press release, CGI announced that Defendant Peavler had been replaced as CFO and Principal Accounting Officer.

26. Defendant Paul A. Will ("Will") has served at all relevant times as CGI's Chief Executive Officer. As the Company's CEO, Will disseminated false and misleading information to investors during the Class Period on earnings calls, and signed and certified several of CGI's false and misleading SEC filings and Company filings, as required by the Sarbanes-Oxley Act of 2002, P.L. 107-204, regarding the evaluation of internal controls over financial reporting and fraud detection ("SOX Certifications"). On July 13, 2017, in a press release, CGI announced that Defendant Will would retire as CEO and Chairman of the Board, to be replaced by Paul C. Svindland.

27. Collectively, Peavler and Will are referred to throughout this complaint as the "Individual Defendants."

28. Each of the Individual Defendants, by virtue of his high-level positions with CGI, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during their tenure with the Company, as alleged herein. As set forth below, the materially false information conveyed to the public was the result of the collective actions of these individuals. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, or was aware or recklessly disregarded that these statements were being issued regarding the Company.

29. As senior executive officers and/or directors of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was traded on the NYSE, and governed by the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded common stock would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period.

30. The Individual Defendants, because of their positions of control and authority as senior executive officers and/or directors of CGI, were able to and did control the content of the

SEC filings, press releases, and other public statements issued by CGI during the Class Period. Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed herein.

31. The Individual Defendants, because of their positions of control and authority as senior executive officers and/or directors of CGI, had access to the adverse undisclosed information about CGI's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at CGI management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about CGI materially false and misleading.

32. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CGI common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding CGI's business, operations, and management, and the intrinsic value of CGI common stock; and (ii) caused Lead Plaintiffs and members of the Class to purchase CGI common stock at artificially inflated prices.

## C. Additional Corporate Entities Relevant to the Case

### *1. Quality Companies*

33. Quality Companies business unit ("Quality") is a wholly owned subsidiary and business unit of CGI. Quality provides a suite of "tractors under management" services, which included tractor purchasing and sales, maintenance, loan and lease servicing, repossession, and

other services to independent contractor drivers, Element Financial Corp (defined below), and other financing partners. Quality grew significantly from 750 tractors under management at the end of fiscal 2013 to 11,300 tractors under management at the end of fiscal 2016.

*2. Element Financial Corp.*

34. Element Financial Corp. ("Element") provides equipment financing services to manufacturers, distributors, and franchisors across North America. The company offers standard lease/loan products, including true lease, lease purchase, and full payout lease; and customized and structured solutions, including deferred payments, bundled service financing, and dealer rentals for organizations in construction and industry. Element is headquartered in Toronto, Canada, and its stock trades on the Toronto Stock Exchange. In March of 2014, CGI entered into a series of agreements with Element, under which Element, *inter alia*, (1) purchased equipment (in the form of trucks and tractors) from Quality, (2) purchased portfolios of independent contractor truck leases from Quality, (3) and directly provided financing to CGI's independent contractors. On October 3, 2016, Element Financial separated into two independent public companies, a fleet management company (Element Fleet Management) and a North American commercial finance company (ECN Capital).

*3. 19th Capital I*

35. On September 28, 2015, CGI entered into a joint venture called 19th Capital Group LLC ("19th Capital I") with Tiger ELS, LLC, an entity controlled by Larsen MacColl Partners. 19th Capital I was established with capital contributions from CGI (33.33%) and Tiger ELS, LLC ("Tiger") (66.67%). Members of Celadon's management, including the Individual Defendants, held membership interests in 19th Capital I. 19th Capital I was established to purchase portfolios of Quality's independent contractor leases and associated assets, similar to

the arrangement between CGI and Element. Under related agreements, described herein, Quality provided administrative and servicing support for 19th Capital I's lease and financing portfolio, driver recruiting, lease payment remittance, maintenance, and insurance services. In December 2016, 19th Capital I was recapitalized as 19th Capital II, as described below.

*4. 19th Capital II*

36. On December 30, 2016, CGI entered into a joint venture with Element ("19th Capital II"). 19th Capital II was formed with all leasing assets managed by Quality and formerly held by a combination of CGI, Element, and 19th Capital I. The joint venture, when established, held over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets. 19th Capital II was formed through recapitalization of 19th Capital I and the interests of the owners of 19th Capital I were redeemed. The Individual Defendants received proceeds from the redemption of approximately $530,000 using pre-transaction cash of 19th Capital I and new equity contributed by CGI and Element. As part of the transaction, all previous agreements between CGI, Element, 19th Capital I, and their respective affiliates, were terminated or assumed by 19th Capital II with no liability of CGI. Quality provided leasing management services to 19th Capital II in exchange for a monthly fee per tractor.

## IV. SUBSTANTIVE ALLEGATIONS

### A. CGI Business Overview

37. CGI is one of North America's largest truckload freight transportation providers. The company has grown principally through acquisition, acquiring 36 trucking companies since 1995. As of June 30, 2016, CGI employed 5,979 persons, of whom 3,688 were drivers, 313 were truck maintenance personnel, 1,449 were administrative personnel, and 529 were dedicated services personnel. At its core, CGI is a trucking company, shipping various types of freight

within the United States, Mexico, and Canada. CGI complements it trucking services with a variety of warehousing, supply chain logistics, tractor leasing, and other services.

38. CGI initially operated its business under two reportable segments: "asset-based" and "asset-light." CGI's asset-based services include United States domestic dry van, refrigerated, and flatbed service; cross-border service between the United States and each of Mexico and Canada; intra-Mexico and intra-Canada service; dedicated contract service; regional and specialized short haul service; and rail intermodal service. CGI's asset-light services include freight brokerage, warehousing, less-than truckload consolidation (i.e. the shipping of relatively small freight), and supply chain logistics services. The "asset-based" services are provided using CGI tractors and trailers while "asset-light" services are contracted through other trucking companies, railroads, or warehouse owners, requiring less capital expenditure than CGI's "asset-based" services.

39. Celadon eventually added the "equipment leasing and services" reportable segment to account for the rapid growth of Quality. Through Quality, CGI provides "tractors under management" services, which includes tractor purchasing and sales, maintenance, loan and lease servicing, repossession, and other services for (1) independent contractor drivers, (2) Element, and (3) other financing partners. Quality was initially tasked with selling off older equipment used in the CGI fleet, but grew from 750 tractors under management at the end of fiscal 2013 to 11,300 tractors under management at the end of fiscal 2016 as Quality expanded rapidly into truck leasing.

40. The trucking industry is capital intensive in that it requires the purchase of significant capital assets (trucks) to move freight. Celadon funds these capital assets with a combination of capital and operating leases, cash flows from operations, and borrowings under

its line of credit. As part of the expansion of Quality, Celadon expanded the use of independent contractors within its operations, in part, to reduce capital requirements associated with moving freight, and bolstering its "asset light" reporting segment. Independent contractors supply one or more tractors and drivers to provide transportation services for CGI and pay their own tractor expenses, fuel, maintenance, and driver costs and must meet certain specified safety guidelines.

**B. The Rapid Rise of Quality**

41. Celadon continued to grow, but needed increased liquidity to finance its operations and acquisitions. Indeed, by December 31, 2013, Celadon had increasingly taxed its credit facilities to the point that the Company was leveraged at nearly 75 percent of its total credit line. In other words, while CGI was authorized to borrow up to $200 million under its credit facility the Company already had $149.7 million in outstanding borrowings. This represented an increase of nearly $50 million in debt since September 30, 2013.

42. So, while Quality's role had historically been limited to disposing of CGI's used equipment, in March 2014 Celadon saw an opportunity to use Quality to increase its cash position. In March of 2014, CGI entered into a series of agreements with Element, under which Element purchased large portfolios of independent contractor leases from CGI through Quality. In effect, CGI purchased tractors at wholesale, leased the tractor to an independent contractor or fleet through Quality, and then sold the tractor and lease to Element. Quality then collected payments from lessees on behalf of Element and serviced the lease.




43. On March 31, 2014, CGI announced its agreement to sell its independent contractor lease portfolio and associated assets to Element. Defendant Will noted that the "***transaction will allow [CGI] to reduce the amount of debt on our balance sheet***, while at the same time providing us with the ability to expand and develop our fleet through a more asset-light model." In effect, the sale of the lease portfolio and associated assets consisted of Element purchasing all rights, title and interest of CGI in the leases and CGI conveying the trucks that were subject to the leases to Element. The lease portfolio sold to Element included approximately 600 leases and trucks that were currently in service with independent contractors of CGI and other partner carriers.

44. As consideration for the sale of its lease portfolio in March 2014, CGI received approximately $53 million from Element, which it planned to use to pay down its bank line that had been inflated by a recent string of acquisitions. As part of the transaction, CGI also entered into various agreements with Element under which CGI, through Quality, would continue to

provide ongoing maintenance and repair services as well as other administrative services for Element on the financed tractor units. With this agreement, however, Quality would now be primarily servicing the leases and tractors sold to Element instead of merely disposing of CGI's old equipment.

45. On April 1, 2014, Element issued a press release informing investors that "[f]uture origination volumes under the [agreements with CGI] are expected to average between US$20 million and US$25 million annually." The agreement with Element thus provided CGI with the ability to generate cash, pay down its debt that had been inflated by recent acquisitions of smaller, distressed trucking companies, replace older trucks in those fleets and in its own fleet, and fund future acquisitions.

46. Notably, over 70% of the leases sold to Element called for variable lease payments related to the miles driven by each lessee in a given month. In other words, if a lessee only drove 950 miles out of the 1000 miles forecasted for a given month, CGI would only be able to collect 95% of the lease payment from the lessee. Under the agreements with Element, should the total payment derived from the leases fall short of the expected payment (because the lessee had driven less miles than forecasted or was otherwise in default), CGI was required to indemnify Element from a special "Recourse Pool" established for that purpose and representing 10% of the purchase price of the leased asset sold to Element.[4] Thus, if actual lease payments collected were $950 versus an expected payment of $1000, CGI would be required to reimburse Element $50 from the recourse pool to cover the shortfall, payable at the end of the lease term.

47. Further, under retroactive agreements with Element, CGI was obligated to ***advance to Element*** any shortfall between the required lease payments and amounts actually

---

[4] *See* Program Agreement attached as Exhibit 10.1 to the Form 10-Q filed by CGI on May 12, 2014.

collected from the independent contractor lessees (the "Lease Shortfall Advances"), ***even if those amounts were to exceed*** the "Recourse Pool." For example, if the expected lease payment was $1000, and CGI only collected $850 from the lessee, CGI would be required to pay Element $1000, with the first portion of the shortfall sourced from the "Recourse Pool," payable at the end of the lease term, and the remaining portion of the shortfall payable immediately. These immediate payments for shortfalls in excess of the Recourse Pool became known as the Lease Shortfall Advances. Pursuant to the Amended and Restated Service Agreement dated November 14, 2014, Element was then obliged to reimburse CGI for these Lease Shortfall Advances only when it disposed of the ***entire tranche of tractors*** to which the shortfall related. For example, CGI could pay Element $30 million in Lease Shortfall Advances and not be entitled to repayment until the end of the lease and/or the disposition of the leased assets, which could easily exceed the 38 month average lease term.

48. Thus, while the Element transaction gave CGI ready access to much needed cash in the short term to pay down its debt and fund future acquisitions, it also created a huge potential liability in the form of the Lease Shortfall Advances if the lease portfolio underperformed. Disregarding this risk, and realizing the potential opportunity this presented to generate substantial cash, CGI management expanded the mandate of Quality to include the acquisition and disposition of assets ***outside of Celadon's normal operations***. Thus, CGI would begin buying new trucks, lease the trucks to third-parties through Quality, sell the lease and associated asset to Element, and service the lease through Quality. Quality had thus evolved from an entity that historically disposed of used trucks from CGI's fleet, to an entity that leased and/or sold trucks to CGI's independent contractors and other third-parties.

49. On the October 30, 2014, 1Q15 earnings call, Defendant Will reported an abnormally large "gain and disposition of equipment of $4.6 million compared with prior year of $1.2 million." Defendant Will attributed approximately $2 million of the gain to the disposition of equipment operated in CGI's fleet and the remaining $2.6 million to CGI's expansion of Quality. Defendant Will further explained that Quality equipment sales had historically been focused on maintaining and disposing of Celadon assets, but that "[r]ecently, ***it has expanded its focus to include acquiring and disposing assets outside of Celadon's normal operation***." Signaling an even more robust deviation from Quality's historical practice of only disposing of CGI owned assets, Defendant Will forecasted the total gain on disposition of equipment run rate to increase to approximately $5 million to $7 million in the December 2014 quarter.

50. Initially, CGI's plan to increase its liquidity via Quality's leasing enterprise seemed to work. On February 9, 2015, CGI disclosed that it realized total net sales proceeds from the sale of leases to Element of $127.7 million, with a net gain of $5.6 million through December 31, 2014. The primary purpose of these transactions, as described by CGI in its 2Q15 10-Q, was to reduce "***reduce our debt*** [and] facilitate continued use of independent contractors."

51. In connection with its newly expanded leasing enterprise via Quality, and starting with the release of CGI's 2Q15 financials on February 9, 2015, CGI's balance sheet reflected a line item for Equipment for Resale, which included equipment purchased to sell to Element. As of December 31, 2014, CGI held $26.33 million of equipment for resale on its balance sheet. This was the first significant increase in that account, as balances traditionally carried in the Equipment for Resale account had not exceeded $8 million in the prior year.

52. During the 2Q15 earnings call on January 29, 2015, analysts inquired about the growing amount of equipment for resale on the balance sheet. An analyst from BB&T Capital

Markets asked whether "the equipment held for sale of $26.33 million, is that just trucks in the core Celadon fleet, or does that include the Quality effort that sort of is the market place at large?" Defendant Will responded that it was "pretty much all Quality equipment. When we look at that, that is running around a 45-day inventory." The equipment for resale account was thus represented as a transitory account on the balance sheet representing some assets that had come out of CGI's operating fleet but mostly assets that CGI had purchased and intended to sell to Element.

53. CGI reported gain on sale of revenue equipment of $4.0 million in the second quarter of fiscal 2015. This increase was due partially to the equipment that CGI sold to Element through Quality, but primarily related to the sale and replacement of equipment CGI acquired through acquisitions. Defendant Will also noted during the 2Q15 earnings call on January 29, 2015, in response to an analyst question about where the equipment sold was coming from, that "[o]n a go-forward basis we think it will be 80/20. 80 being non-Celadon [*i.e.*, Quality] equipment coming out." This signaled an increasing reliance on the Quality business and transactions with Element to generate cash and pay down debt, as these transactions represented a growing percentage of the gain on sale reported each quarter.

54. CGI reported for 3Q15 that total net sales proceeds from the transactions with Element during the nine months ended March 31, 2015 period ***were $208.1 million*** which resulted in a net gain of $7.0 million in the three-month period ended March 31, 2015 - up from $5.6 million in the prior quarter. Gain on sale of revenue equipment was $5.6 million in the third quarter of fiscal 2015, attributable primarily to the Element transactions. As of March 31, 2015, in effect, origination volumes under the agreements between CGI and Element drastically exceeded the forecasted average of between $20 million and $25 million annually initially

disclosed by Element, boosting CGI's gain on sale revenue, increasing CGI's cash position and liquidity, and rapidly growing the number of leases managed by Quality. CGI carried $41.27 million of equipment for resale on its balance sheet as of 3Q15.

55. Disclosures concerning Quality were sparse. Analysts struggled to understand the evolution of Quality given the limited disclosures concerning its operations and CGI's failure to break out those sales in its filings in a less than opaque manner. For example, analysts frequently questioned the breakdown between CGI sales of its own equipment and equipment purchased through Quality for resale, as this would provide at least some indication of the expanding scope of Quality's operations. In response to a question from an analyst at Cowen and Company on the April 29, 2015 earnings call, Defendant Will noted that, going forward, there would not be a lot of additional sale or trade activity on the CGI side, since CGI was nearing completion of its fleet refresh. In effect, CGI had finished selling off its own equipment after replacing older trucks in its fleet, and Quality would now focus its efforts almost entirely on selling the increasing amount of newly purchased and leased equipment to Element.

56. As reported in its 10-K, by the end of fiscal 2015, Quality had grown significantly from 750 tractors under management at the end of fiscal 2013 to ***4,900 tractors under management at the end of fiscal 2015***. More significantly, CGI had placed an even bigger bet on Quality, disclosing that it had ordered ***13,000 tractors at an aggregate estimated purchase price in excess of $1.5 billion***.

57. On September 10, 2015, in its Form 10-K, CGI reported that gain on sale of revenue equipment increased from $6.6 million in fiscal 2014 to $23.6 million in fiscal 2015. Touting the rapid growth of Quality and its ability to generate cash, Defendant Will informed the market during the 4Q15 earnings call on July 30, 2015, that the Company's $9.5 million gain on

sale of equipment for the quarter was achieved entirely from the sale of third-party equipment by Quality. Defendant Will also informed investors that, going forward, CGI expected all gains to be related to third-party sales and leasing. Defendant Will forecast that Quality would earn between $10 and $12 million in 1Q16 through gain on disposition of equipment.

58. As explained in the September 10, 2015 Form 10-K, by June 30, 2015, equipment held for resale was $102.447 million.[5] ***Total net sales proceeds of units purchased with the intent to sell during the fiscal year ended June 30, 2015 were $329.0 million***. Defendant Will also disclosed that "[d]ue to significant growth of our Quality division, approximately $100 million of our current balance sheet debt reflects assets held for [re]sale. ***This amount represents approximately 45 days*** of equipment inventory based on the current sales and leasing levels, which we expect to increase in subsequent quarters." This signaled that Quality would continue to increase its sales and leasing business.

**C. Analysts Questions Quality's Sustainability**

59. In order to keep Quality growing at its rapid pace, CGI would have to continue to purchase tractors, seat them with lessees through Quality, and then sell the lease and tractor to Element. At the same time that CGI was increasing its purchases of tractors, however, the used tractor market was beginning to slow down. Analysts were concerned at the growing amount of equipment held for resale on CGI's balance sheet. For example, during the Company's 4Q15 conference call, on July 30, 2015, analysts zeroed in on the critical question affecting Quality's business: exposure to the used truck market. In effect, CGI's "equipment held for resale" line item was intended to represent equipment purchased to sell to Element. But, as demonstrated by the increasing amount of equipment held for resale of CGI's balance sheet over the last two

[5] In various financial reports, the balance sheet line item for "equipment for resale" was called "equipment held for resale."

quarters, sales to Element had been outpaced by trucks coming out of CGI's fleet and new truck purchases, growing the account to $102.447 million by June 30, 2015. Defendant Will downplayed these concerns, stating that "on a go-forward basis, it's really probably more like 80% new equipment, 20% used equipment. So, therefore, the used equipment market is not as impactful in the process that we're going through. And, as far as the sale of equipment, it's probably 25% equipment being sold, 25% to 30% equipment being sold outright, and the rest is from a lease perspective where third parties come in and finance that equipment. So, we've got a pretty good blended mix of sales, leasing, new, used, trucks, trailers." In effect, Defendant Will assured the market that CGI would not be affected by the declining used truck market based on the manner in which the Company was disposing of its equipment held for resale.

60. On July 30, 2015, on the 4Q15 earnings call, Defendant Will disclosed that assets held for sale had skyrocketed to $150 million, with approximately $100 million belonging to Quality and the other $50 million coming out of CGI's fleet. Further, the "$100 million as it relates to the Quality entity, ***I think what you're going to see is that that will probably reside there.***" When asked if CGI's debt level was "maxed out" with the $150 million of equipment held for resale, Defendant Will responded, "Yes." At June 30, 2015, CGI had just $66.8 million of available borrowing capacity remaining under its revolving credit facility.

61. Expressing the "difficult time" analysts were having understanding Quality, Todd Fowler of KeyBanc Capital markets asked Defendant Will to go back to basics and "talk at a high level what Quality companies are doing and how that fits in with your business." Defendant Will provided a longwinded response that did little more than establish that Quality was still rapidly evolving and falsely assured the market that Quality's business model was viable.

62. Notwithstanding the recap of Quality's history, analysts continued to question Celadon's exposure to the used truck market and the value of the assets managed by Quality. John Larkin from Stifel Nicolaus & Co. asked "On the Quality side, how much of the ongoing profitability of that operation is a function of the used truck market remaining strong?" Defendant Will again downplayed CGI's exposure to the used trucking market, stating that "as I said earlier like on the Celadon equipment, I think some of the equipment that came out of the Celadon equipment because of the way that it was perceived or valued by the outside market, it was probably more challenging to get gains or higher profit margins on that Celadon equipment. But, on a go-forward basis, it's really probably more like 80% new equipment, 20% used equipment. So, therefore, the used equipment market is not as impactful in the process that we're going through. And, as far as the sale of equipment, it's probably 25% equipment being sold, 25% to 30% equipment being sold outright, and the rest is from a lease perspective where third parties come in and finance that equipment. So, we've got a pretty good blended mix of sales, leasing, new, used, trucks, trailers. And then, as I said, there's other services that we're rolling out as well."

63. On June 8, 2015, CGI appointed Peavler as Executive VP, CFO, and Treasurer. Leslie Tarble was also appointed EVP, CFO, and Treasurer of Quality.

### D. 19th Capital I: CGI Moves Assets Off Balance Sheet to Enrich its Management and Reduce Debt

64. By the end of 1Q16, CGI was in a precarious position. It had amassed a large number of tractors with the intention of selling them to Element, but the declining truck market and poor performance of the lease portfolio reduced Element's interest in purchasing these trucks. This left CGI with the $150M of equipment disclosed at the end of 4Q15 on its balance sheet and diminishing prospects to sell it. At this time, CGI also had outstanding commitments to

purchase approximately $60.7 million of new equipment that would further inflate its equipment held for resale. CGI needed to somehow get the trucks (and related debt) off its balance sheet and come up with a new plan to increase its liquidity to pay down its credit lines.

65. On October 2, 2015, CGI announced the formation of a joint venture with 19th Capital Group ("19th Capital I") and related agreements between Quality and 19th Capital I. 19th Capital I was designed to mimic earlier transactions with Element under which CGI would sell leased assets to 19th Capital I in return for cash, and service the leased assets through Quality. The notable difference was that CGI, through its ownership of 19th Capital I, would now share directly in the underlying economics of the leased assets.

66. 19th Capital I was established with capital contributions from CGI (33.33%) and Tiger ELS, LLC ("Tiger") (67.67%), an entity controlled by Larsen MacColl Partners, an unaffiliated investment firm ("Larsen"), in return for Class A equity. Class B equity in 19th Capital I was distributed among (i) Tiger (48.00%), (ii) 19th Capital I employees ( 4.00 %), (iii) CGI (25.00%), (iv) Quality employees (9.00 %), and (v) CGI employees (14.00 %). Class B members included both Individual Defendants (Paul Will and Bobby Peavler), as well as George Chasteen, Beau Zoeller, Danny Williams, Leslie Tarble, William E. Meek, Lauren Howard, Nathan Roberts, Chad Hoffman, and Mike Gabbei. Certain relationships between CGI and Class B members are described below:

| Class B Member | Relationship |
|---|---|
| Danny Williams | Chief Operating Officer of Quality |
| Leslie Tarble | Executive Vice President, Chief Financial Officer, and Treasurer of Quality |
| William E. Meek | President and Chief Operating Officer of the Company |
| Paul Will | Chief Executive Officer and Chairman of the Company |
| Bobby Peavler | Executive Vice President, Chief Financial Officer, and Treasurer of the Company |
| Lauren Howard | Divisional President, Truckload Operations of the Company |
| Nathan Roberts | Divisional President, Eagle Logistics Services, a division of the Company |
| Chad Hoffman | Divisional President, Specialized Services, a division of the Company |
| Mike Gabbei | Chief Information Officer of the Company |

Defendant Will and COO Meek were appointed the managers of 19th Capital I.

67. 19th Capital I thus presented an opportunity to try to reduce the amount of debt on Celadon's maxed-out balance sheet while simultaneously gifting management free Class B interests in the joint venture. The joint venture was set up so that if the performance of the assets in the joint venture exceeded the 12% preferred return due to the Class A interests, holders of the Class B interests could expect a windfall. Under the related agreements, 19th Capital I purchased a portfolio of Quality's independent contractor leases and associated assets for approximately $13.6 million.

68. But despite the new joint venture, tractors continued to accumulate on CGI's books. While in October 2015, CGI reported that it achieved gains on sales of assets of $13.2 million in the September 2015 quarter, it also told the market that its ***equipment held for resale had increased to $175.125 million***. Total net sales proceeds of units sold to Element during the quarter ended September 30, 2015 were $152.5 million. The net gain as a result of those transactions in the quarter ended September 30, 2015 was $12.9 million.

69. On the 1Q16 conference call, Defendant Will disclosed that, due to the significant growth of the Quality division, "approximately $175 million of our current balance sheet debt reflects assets held for sale. This amount represents approximately $25 million of equipment inventory and $150 million of assets that are under lease to third parties." In other words, leases with CGI and managed by Quality ***had grown 50% in just one quarter***, outpacing sales to Element and 19th Capital I.

70. Todd Fowler of KeyBanc Capital Markets noted that, given the increase, "a couple of the things that investors are concerned about with the story . . . around the exposure to the used truck market. And I know that the way the Quality companies' business is set up is that

you don’t carry a significant amount of risk in reselling equipment,” and asked “But can you just walk through the exposure that you have to both the softer used truck market as it relates to that business.” In response, Defendant Will misrepresented Quality’s exposure to the declining used truck market, noting “I tried to address that question which is of the $175 million that's in equipment held for resale, approximately $150 million of that is already, in essence, on lease to be sold off, if you will. ***So therefore, we don’t really have any exposure necessarily to a declining equipment market***.”

71. Defendant Will further noted that of the $150 million of equipment held for sale that “Quality ends up leasing the equipment out, and then you basically sell that lease portfolio. So it’s equipment that has already been leased off that's in the process of being sold, which is kind of what we've done all along with our findings and third party financing arrangement. So therefore, Quality does not hold any of the assets on the books.”

72. From April of 2015, through January 2016, CGI’s share price declined approximately 75 percent. Analysts understood that this was attributable to the growth of the Quality division. As BB&T Capital Markets wrote on January 21, 2016, “one of the biggest factors weighing on the stock has been the rapid growth of CGI’s Quality Companies (QC) division at a time when the used equipment market is weakening.” In addition to the general concerns surrounding Quality, another analyst also stated that investors “are concerned that QC's financial partners (Element, 19th Capital [19th Capital I], and others), who buy equipment from QC and then lease it to independent contractors (ICs), could limit their future participation due to account or industry concentration limits. Some investors have also been turned off by [19th Capital I’s] structure, which grants CGI and QC management ‘Class B’ interests that could be

lucrative but might potentially represent a conflict of interest . . . [T]hese factors have exacerbated CGI's weakness versus its . . . peers . . . ."

73. Analysts were keenly aware the rapid increase in the amount of equipment held for resale on CGI's books. In that same January 21, 2016 report, an analyst from BB&T Capital Markets commented that because only "[a]bout 25% of the total [equipment managed by Quality] is new equipment (the remainder is used)" . . . "***the most significant risk CGI faces due to its equipment holdings is from falling equipment prices (especially for used equipment), which if severe enough, could result in a write-down.***"

74. CGI announced its 2Q16 earnings on January 27, 2016. Therein, CGI reported that gains on sales of assets were $5.5 million for the quarter, down sharply from the $13.2 million reported in the prior quarter. The dramatic decrease in gain on sale was attributed to "lower sales volume of assets in the quarter related primarily to the holiday season as well as ***the timing of funding within the period.***" As reported by Stephens on January 27, 2016, the "biggest delta" to CGI's earnings for the quarter was its shockingly low gain on sale of equipment, which missed Company and analyst estimates by nearly $4 million.

75. At this time, CGI had outstanding commitments to purchase approximately $83.5 million of revenue equipment, and total net proceeds of units sold during the three and six months ended December 31, 2015 was $121.3 million and $273.9 million, respectively. The net gain as a result of these transactions in the three and six months ended December 31, 2015 was $7.2 million and $21.9 million, respectively. Thus, CGI's net gain on sale as a percentage of net proceeds of units sold to Element decreased from 9.6% in 1Q16 to 5.93% in 2Q16. This decrease reflected the impact of the depressed used truck market as well as the poor performance underlying the leases and associated assets sold by CGI.

76. Net sales proceeds to 19th Capital I of units totaled $35.8 million and $49.4 million for the three and six months ended December 31, 2015, respectively. The net gain as a result of these transactions was $2.7 million and $2.8 million, respectively. Thus, CGI's net gain on sale as a percentage of net proceeds of units sold to 19th Capital I increased from 0.07% in 1Q16 to 7.5% in 2Q16. The small gain on sale achieved through transactions with 19th Capital I would do little to ameliorate CGI's growing liquidity constraints.

77. Amid a rapidly declining used truck market, CGI also reported a change to its depreciation of equipment: "[E]ffective October 1, 2015, the Company changed its estimates of the useful lives and salvage value of certain tractors and trailers to better reflect the estimated periods during which these assets will remain in service. The estimated useful lives of the tractors and trailers that previously were 3 years for tractors and 7 years for trailers were increased to 4 years for tractors and 10 years for trailers." This change deviated significantly from industry peers and served to artificially prop up equipment values by reducing the amount of depreciation on the equipment in a given year.

78. In addition to the depressed net gain realized by CGI as a result of its sales of revenue equipment, CGI's Form 10-Q for 2Q16 disclosed that "Quality's business has grown rapidly, but ***the rate of growth has recently slowed and is expected to remain constrained in the near future due to lower amounts of purchases by our funding sources.***" Contemporaneous with this disclosure, CGI entered into a Letter Agreement with Element under which CGI was obligated to contribute an additional $2.5 million to the Reserve Account. Further, the letter agreement—a two-page document—mentioned for the first time a "Perfect Pay" obligation, but did not define the term or otherwise describe its meaning. In effect, CGI's funding was drying up and the quality of the lease portfolios managed by its "funding sources," Element and 19th

Capital I, were deteriorating, further depressing the prices CGI could realize on sales of equipment and associated leases.

79. On January 28, 2016, during the Company's 2Q16 earnings call, analysts hounded Defendant Will with numerous questions concerning Quality and its future prospects. Specifically, Aaron Reeves of BB&T Capital Markets asked: "Could you just explain a little bit how with the used equipment market as soft as it is right now and I know you said only about 20% is maybe used but how can you be so confident that you can get that off your books in that period of time without having any kind of a write down or some kind of loss?" In response, Defendant Will provided two false rationales as to why Celadon would not have to take a write down on its equipment. First, of the $130 million of equipment on its balance sheet, approximately $50 million was already leased out, and there was sufficient funding in place from CGI's "funding sources" to purchase those leases from CGI within the next three to six months. Second, since Quality could also sell or lease trucks into the retail space, "the retail dollars they get are significantly higher that . . . where they are at on the books today." Purportedly to dispel the "confusion about how you move the $130 million of assets held for sale off of CGI's books," Defendant Will again stated that the leased equipment held for sale was equipment that CGI had leased out to drivers and was in the process of being sold to its "funding sources."

80. On April 27, 2016, CGI released its earnings for 3Q16. Therein, CGI disclosed that it was "transitioning our Quality business from a model heavily weighted in equipment sales and related gains to one focused on an annuity based income model related to multiple service offerings to better serve our customers. These service offerings include sales, leasing, business services, maintenance, and insurance." Purportedly as a result of this transition, CGI "recorded a lower gain on disposition of equipment of $2.0 million in the March 2016 quarter compared with

$5.6 million in the March 2015 quarter." This transition was promoted by the fact that CGI's funding partners had lost their appetite for purchasing leases from CGI in a declining trucking environment.

81. In its 3Q16 Form 10-Q released on May 10, 2016, CGI disclosed total net proceeds of units sold during the three and nine months ended March 31, 2016 was $30.4 million and $318.6 million, respectively. The net gain as a result of these transactions in the three and nine months ended March 31, 2016 was $2.0 million and $20.8 million, respectively. The net sales proceeds of units total $49.4 million for the nine months ended March 31, 2016. The net gain as a result of these transactions was $2.8 million. ***There were no sales in the three months ended March 31, 2016***. Gain on sale of revenue equipment decreased from $5.6 million in third quarter of fiscal 2015 to $2.0 million in third quarter of fiscal 2016. According to the Company, "***This decrease was due to decreased equipment sales to third parties resulting from a slightly weaker used tractor market.***"

82. Defendants disclosed on their 3Q16 earnings call on April 28, 2016, that "[l]eased assets and assets held for sale represented approximately $135 million at the end of March quarter. Of the $135 million, approximately $56 million was leased at the end of the period, which generated $6 million of lease revenue held in other revenue." Defendant Will noted that ***"[w]ith the reduction of the* [*Quality business*]**, we have seen a slight sequential increase in equipment held for sale, as we parked these assets for disposition. We had some equipment sale transactions carried over into the June quarter, where we still anticipate selling or leasing of remaining assets and equipment held for sale over the next 90 days to 120 days."

83. During CGI's 3Q16 earnings call, analysts again expressed concern about Quality, with a Buckingham Research analyst noting that those results had "overwhelmed" other positive developments in the quarter.

84. On July 6, 2016, pointing to the lack of transparency involving Quality and related transactions, an analyst from BB&T Capital Markets noted that if CGI wanted to "re-establish [its lost] credibility," it needed to clean up its financial reporting, because "[f]or a company with a market cap of less than $300M, we believe there are too many byzantine filings on Quality, 19th Capital and other aspects compared to peers."

85. CGI missed its usual reporting deadline for its 4Q16 and FY 16 results. On August 16, 2016, analysts from Stephens speculated that "the most likely reason for the delayed release is a result of more stringent review of CGI's assets on the books. CGI is reporting its fiscal year-end results, and we tend to believe a more thorough review of assets held on the balance sheet occurs at year end. ***Given the weak used truck market, and some of the confusion around CGI's Quality leasing business, we believe this more detailed review combined with the potential write down / impairment of assets is the most likely reason for the delay.***"

86. CGI did not hold an earnings call for its 4Q16 and FY 16 results.

87. On September 1, 2016, Celadon released its earnings for 4Q16 and FY16. CGI reported disappointing income for the quarter, that was primarily attributable to an approximately ***$7.8 million decline*** in gain on disposition of equipment. CGI further reported that ***"[t]he assignment of leases and sale of leased assets to financing sources has been significantly reduced since March 2016 as Quality's financing sources have tightened. Quality continues to sell leased assets and other used equipment on a smaller scale."*** At June 30, 2016, leased assets held for sale, were approximately $24.9 million and revenue equipment

held for sale was approximately $45.0 million, compared to $52.6 million and $49.9 million at June 30, 2015. CGI also disclosed for the first time in its Form 10-K that it had paid Element $31.9 million in Lease Shortfall Advances in excess of the initial 10 percent reserve and accounted for this "receivable" under "other assets."

88. Significantly, CGI also disclosed that it had received $30 million in net proceeds from the disposition of leased equipment to 19th Capital I, with a book value of approximately $37.7 million, with $30 million recognized under the current portion of other accrued liabilities and the remaining $7.7 million under the long term portion of other liabilities since the remaining $7.7 million was estimated to be paid down over an estimated period of 49 months. This deal differed from prior transactions with 19th Capital I insofar as CGI itself now had exposure to the performance of the leased equipment sold to 19th Capital I in the form of a holdback. ***This represented a staggering 20% hold back on the book value of the leased equipment***, a significant red flag signaling that the value of the assets was impaired at the time of the sale.

89. On September 2, 2016, a KeyBanc analyst reported on a call with management during which management conveyed that the $45 million of assets held for sale had been "***reviewed for impairment, and will likely be realized at book value***. Additionally, $99M related to a leasing portfolio is included in long-term assets, $63M of which is company-owned, and $36M shared with a third-party funding group and expected to be paid down over ~49 months."

90. In CGI's full year 2016 financial report, filed on Form 10-K with the SEC on September 13, 2016, the Company explained that the ***"demand for trucking services and the market for used tractors have both weakened"*** and that ***"[t]hese factors have depressed Quality's earnings and created negative cash flows associated with our obligation to advance***

***certain amounts to [Element].”*** Put simply, CGI was hemorrhaging money as a result of its Lease Shortfall Advance obligations. Given the significant cash burn associated with the Lease Shortfall Advances in a deteriorating trucking environment, analysts’ near-constant focus on the amount of equipment held on CGI’s balance sheet, and the possibility of violating its debt covenants, CGI devised a plan to move all of its leased assets off its books. CGI announced that it had signed an MOU with Element “under which substantially all of Quality’s tractors under management owned by such third-party financing provider, 19th Capital [which in 2015 purchased a portfolio of the Quality Companies’ independent contractor leases], and Quality would be combined into 19th Capital as a joint venture” (“19th Capital II”). The Company further explained that existing agreements with Element would be terminated and replaced with definitive agreements contemplated by the MOU.

91. On October 19, 2016, CGI filed as an 8-K its response to questions submitted to CGI by an investor named Jay Yoon on October 11, 2016. Mr. Yoon’s questions generally addressed perceived inconsistencies in CGI’s financial reports, with a particular focus on the accounting surrounding various classifications of equipment held for sale. In particular, Mr. Yoon asked why CGI had capitalized lease advance payments in other assets. Defendant Peavler responded that “[u]nder the Service Agreement [with Element], amounts advanced by Celadon in excess of the reserve account balance are subject to reimbursement by Element. As of June 30, 2016, the reserve account liabilities have been fully extinguished and therefore the amounts advanced are in excess of the reserve account liabilities . . . Since inception of the Element transactions, we have sold approximately $740 million of assets to Element. From these sales we have established approximately $74 million of reserve liabilities on our balance sheet under ‘Deferred leasing revenue and related liabilities.’ We did not record this portion of the gain on

our income statement as either income or expense. ***As of June 30, 2016 the reserve account liabilities have been fully extinguished and we have advanced amounts in excess of the reserve account liabilities which are subject to reimbursement by Element***." Thus, of the $740 million lease portfolio and associated assets sold to Element, CGI had reimbursed or was required to reimburse Element over $105 million, or 14.2% of the value of the lease portfolio. This indicated a massive underperformance of the lease portfolio and was a clear indicator that the value of the assets in the lease portfolio was impaired.

92. Mr. Yoon's concerns about CGI were summarized in a report titled "Celadon Group: SEC Inquiries, Accounting Issues and Liquidity Constraints Point to 65% Near-Term Downside," published on October 12, 2016 at 10:00 a.m., on the website Seeking Alpha. The report addressed numerous "irregularities" in CGI's financial reports with a particular focus on Quality and CGI managements' concealment of liabilities related to the Quality business. For example, the report exposed contradictions between CGI's 2015 and 2016 10-K filings:

> New disclosures reveal that CGI appears to have mislead in its SEC filings. In its FY2015 10-K, the Company stated that it had no lease payment obligations associated with its Quality business. However, in its FY2016 10-K, it was revealed that the Company paid $31.9mm in lease payment advances to Element Financial, Quality's third-party financing partner. Also, new disclosures in the FY2016 10-K . . . appear to confirm that CGI has improperly excluded Quality's 74mm of reserve account liabilities from its balance sheet.

93. The report also identified ten separate "accounting irregularities" related specifically to Quality's business. In response to Mr. Yoon's published concerns, shares of Celadon fell 10.23 percent, or $0.84 per share, to close at $7.80 per share.

94. On November 2, 2016, CGI issued a press release announcing its financial and operating results for the three months ended September 30, 2016. The disappointing net income reported in the press release was attributed to "$12.0 million, or 28 cents per diluted share, decline in gain on disposition of equipment. ***This decline related to discontinuing sales of new***

***equipment by our Quality Companies subsidiary, which sold zero new units in the September 2016 quarter***, sale of fewer tractors and trailers formerly used in our trucking operations, and lower gain on sale per unit due to a weak market for used revenue equipment." The press release further stated that "Revenue related to Quality's business is reflected in other revenue in key operating statistics and was approximately $9.3 million for the September 2016 quarter, compared to $3.8 million for the September 2015 quarter. The increase in revenue is related to the increase in leased assets owned by Quality."

95. CGI further reported that "For the quarter, gain on disposition of equipment was approximately $1.3 million, compared with $13.2 million in the same quarter of 2015. ***The reduction in gain was primarily due to no sales of tractors and trailers to financing sources (all Quality equipment) and fewer sales of tractors and trailers to wholesale and retail buyers (combination of Quality equipment and Celadon trucking fleet equipment), as well as lower prices per unit. Despite the soft used equipment market we continued to record gains on disposition of tractors and trailers during the quarter.***" Following its earnings release, shares of Celadon fell 11.38 percent, or $0.70 per share, to close at $5.45 per share on November 3, 2016.

96. During the 1Q17 earnings conference call on November 3, 2016, analysts questioned the "residual values and salvage values assumed on assets as it pertains to your depreciation schedule." Defendant Will, eager to reassure the market that CGI was properly valuing its equipment, stated that "***[w]hat we've got, we believe the way we've evaluated or valued our equipment and the timeframe in which it's going to be depreciated over is currently appropriate relative to what we think the value is going to be, when we dispose of it***." Still confused by Defendant Will's response, the analyst sought clarification as to whether CGI was depreciating its Celadon and Quality equipment differently. Defendant Will responded that

"they're different in - the leasing equipment that we've got is depreciated in a manner, which it will generate the right revenue stream and expense stream so that when that equipment is disposed of, the goal is to not have any negative impact from a P&L standpoint. ***So as we look towards this transaction based on that equipment and how we would depreciate that equipment, we don't believe that there will be any negative impact - anything going into the joint venture.***"

97. Analysts appeared to be perplexed by the MOU signed with Element, asking directly "why would Element do something that was in your favor? Anything that goes in your favor is going to be not in their favor. Can you help me understand why they would do an MOU to change the terms?" Defendant Will responded that "I think the MOU itself, it ends up creating a beneficial ratio of 50:50 joint venture that does not do anything to harm their current position. I think, what it does is it further enhances the ability for the two parties to work together, combining all the assets to be more efficient in how we're running the business itself, that's what the goal is. And then there's, obviously, synergistic opportunities we believe with some of the other business units that we can obtain over time as well. So I don't think it has anything do with losing leverage or a position. I think, it's what was believed to be a positive long-term joint venture that should be good for both parties." Unsatisfied with Defendant Will's evasive response, the analyst again asked "I'm sorry, I don't get it. Can you give me an example of something that's going to help, that's going to benefit them, an incentive for them to the change their [rate with you]?" Defendant Will ***refused to respond*** to the analyst's question on the basis that negotiations with Element were still ongoing.

98. In its 1Q17 Form 10-Q, CGI also disclosed that it had received $15 million in net proceeds from the disposition of leased equipment to 19th Capital I, with a book value of

approximately $22.8 million, with $15 million recognized under the current portion of other accrued liabilities and the remaining $7.8 million under the long term portion of other liabilities since the remaining $7.8 million was estimated to be paid down over an estimated period of 39 months. ***In effect, this represented a staggering 35% hold back on the book value of the leased equipment,*** a significant red flag signaling that the value of the assets was impaired at the time of the sale.

99. On December 30, 2016, CGI announced that it consummated the joint venture with Element ("19th Capital II"), disclosing that:

> "The joint venture will hold leasing assets managed by Quality and formerly held by a combination of Celadon, [Element, and 19th Capital I] . . . The joint venture represents the combination of the former equipment leasing portfolios of Celadon, Element, and 19th Capital that were managed by Quality. The joint venture holds over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets. The joint venture is considered to be one of the leading lessors to this market, with an augmented and experienced management team that is focused on driving excellence throughout the business. The joint venture was formed through recapitalizing [19th Capital I]. The former owners of [19th Capital I] (including Celadon's former Class A and Class B interests) were redeemed using pre-transaction cash of [19th Capital I], and new equity was contributed by Celadon and Element to establish the post-transaction capitalization. Celadon's contribution includes cash and lease equipment totaling $100 million in value in exchange for its equity in the joint venture. The cash component was more than offset by proceeds of redemption, settlement of the deferred purchase price on assets sold to [19th Capital I] in FY2016, and collection of an amount relating to the terminated pre-joint venture arrangements. After the contributions, each of Celadon and Element own approximately 49.99% of the [19th Capital II's] equity, with employees of [19th Capital II] holding the remainder. As part of the transaction, all previous agreements between Celadon, Element, [19th Capital I], and their respective affiliates, have been terminated or assumed by the joint venture with no liability of Celadon. Quality has entered into a new Service Agreement with the joint venture and will provide leasing management services in exchange for a monthly fee per tractor."

100. 19th Capital II was thus an opportunity for CGI to move all of the Quality managed assets and associated debt off its books while simultaneously providing a windfall to management of 19th Capital I, including the Individual Defendants. In its Redemption

Agreement filed on February 10, 2017, Celadon disclosed that it received $7.1 million from the redemption of its Class A and Class B shares, consisting of a $4.6 million cash payment at 19th Capital II's closing and a deferred payment of $2.5 million. Defendants Will and Peavler owned a combined 5.5% in 19th Capital.

101. The announcement of 19th Capital II and related transactions assured CGI investors that CGI could in fact move all of the equipment managed by Quality off of its books without taking a writedown. On this news, shares of CGI soared more than 20 percent, or $1.60 per share, to close at $8.75 per share on January 3, 2017. This relief rally would prove fleeting.

102. On February 1, 2017, CGI issued a press release announcing its financial and operating results for the three months ended December 31, 2016. The balance sheet confirmed that substantially all of the equipment held for sale, which includes "leased revenue equipment held for sale," "revenue equipment held for sale," and "leased assets," had been transferred to 19th Capital II or sold to Element under related transactions. The table below reflect changes in these accounts on CGI's balance sheet from 2Q16 through 2Q17 (all figures in '000s):

| **Balance Sheet Classification** | **Period Ended 12/31/15** | **Period Ended 3/31/16** | **Period Ended 6/30/16** | **Period Ended 9/30/16** | **Period Ended 12/31/16** |
|---|---|---|---|---|---|
| Leased revenue equipment held for sale | $49,298 | $56,374 | $24,937 | $17,967 | - |
| Revenue equipment held for sale | $81,016 | $78,822 | $ 44,876 | $28,987 | - |
| Leased assets | - | - | $ 99,300 | $ 111,487 | - |
| Total | $130,314 | $ 135,196 | $169,113 | $158,441 | - |

| | | | | | |
|---|---|---|---|---|---|
| Change from prior period | | $4,882 | $33,917 | $ (10,672) | $(158,441) |

103. The table below summarizes disclosures related to the formation of 19th Capital II and related transactions, roughly accounting for all equipment held for sale on CGI's balance sheet (all figures in '000s):

| **Explained by 19th Capital II Transaction** | **Total** |
|---|---|
| Equipment conveyed (all asset categories) | $56,000 |
| Recognition of Deferred sale from 9/30/16 Transaction | $21,900 |
| Recognition of Deferred sale from 6/30/16 Transaction | $34,600 |
| Separate Sale to Element | $50,000 |
| Total | $162,500 |

104. On the February 2, 2017 call with analysts, John Larkin from Stifel Nicolaus followed up on the asset valuation issue, asking "as you look at your depreciation schedules and you look at your residual values embedded in your accounting policies, have you looked at that recently to see whether any changes are needed in order to reflect the fact that the used truck values have really been hammered so hard here over the last 12 months or so?" Defendant Will responded "***Yes. I mean, we monitor that every month. So we always go through and review where we're at. We feel very confident with where residuals are placed currently. So, we think we're positioned well.***"

105. CGI disclosed in its 2Q17 Form 10-Q filed with the SEC on February 10, 2017, that the Company sold tractors and trailers and assigned the related leases to Element for approximately $50 million. However, a review of Element's financial disclosures for the relevant periods does not reveal a corresponding entry, suggesting that the transaction did not occur under

the disclosed terms. As later confirmed in Celadon's April 2, 2018 Press Release, the transactions with Element "did not sufficiently transfer risk of ownership to qualify for sales."

106. On April 5, 2017, *Seeking Alpha* published a detailed report authored by Prescience Point, alleging that the Company overstated its investment in 19th Capital II by at least $31.8 million, providing, in pertinent part:

> **CGI Lied RE Collecting on its $31.8m Shortfall Receivable. Is this the Smoking Gun that it's Falsifying its Financials?**
>
> Given that the Lease Shortfall Advances were a significant reason that cash flow had turned negative, investors were obviously concerned about these payments. CGI had highlighted that its JV arrangement would not require continued Lease Shortfall Advances.3 8-K from 01/06/2017: "The new Service Agreement does not contain any payment remitting, "Perfect Pay" or similar obligation"
>
> Furthermore, CGI prominently highlighted in its Q2'17 earnings release filed on 2/01/2017 that it collected $31.8 of prior Lease Shortfall Advances from Element. Unfortunately, based on information provided in the JV subscription agreement, it appears that **CGI never actually collected its Lease Shortfall Advances. CGI received a sham daylight loan from the JV**: In the subscription agreement, CGI disclosed that Element provided a "daylight loan" of $31.8m to [19th Capital II], the [19th Capital II] then gave the $31.8m to CGI, and then CGI paid the $3.8m back to [19th Capital II] to pay off the outstanding contribution from Element. What essentially happened is Element gave CGI $31.8m and then CGI handed that $31.8m right back to Element (with [19th Capital II] as an intermediary). The circular transaction created the illusion that CGI collected it Lease Shortfall Advances and made a $31.8m contribution to the [19th Capital II], but this is just accounting gimmicks. No value was ever created or contributed to [19th Capital II].




> The specific details of the Lease Shortfall Advance and related daylight loans are detailed below.
>
> **Element required to repay the Lease Shortfall Advances**: CGI was obligated to provide lease shortfall payments to Element on an ongoing basis. By the end of Q1'17, CGI had made $31.9m in payments to Element. These payments were capitalized (i.e. not expensed) on CGI balance sheet as "Lease Shortfall

Advances" within Other Assets. In its Q1'17 10-Q, CGI noted that Element was obligated to reimburse it for these payments:

"The financing provider is required to reimburse us for these advances and, accordingly, **we have accounted for the related receivable under other assets** on our consolidated balance sheet, in the amount of **$31.9 million** as of September 3 0, 2016, and June 30, 2016."

**CGI claims it collected its Lease Shortfall Advances from Element**: In its 8-K filed on 1/6/2017, CGI claimed its $31.9m lease shortfall receivable had been almost completely reimbursed by Element as part of the JV closing:

**Net Cash Received from the JV Closing**

| *($ millions)* | Q2' 17 |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in JV at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**As disclosed in the subscription agreement, Element loaned money to CGI**: We believe the JV subscription agreement indicates that no collection occurred. Specifically, the subscription agreement details that Element provides a $31.8m "daylight loan" to the JV ( i.e. "the Company" below), and then the JV would give the $31.8m received from Element to CGI.

> *At the closing of the Element Investment,*
>
> *((i)) Element shall transfer, convey, and assign to the Company the Element Assets;*
>
> *(ii) Element shall make a loan to the Company in the principal amount of $31,800,000 (the Element daylight loan), which shall be evidenced by this Agreement, and the Company shall pay $31,800,000 to Celadon in respect of the Payment; (Subscription Agreement, 02/10/17)*

**As also disclosed in the subscription agreement, CGI immediately paid back the loan to Element:** The subscription agreement further details that (1) CGI will

transfer the cash to the JV (i.e. "the Company" below) and the JV would repay the loan from Element. Thus, CGI gave the cash it received from the daylight loan right back to Element at the JV closing. This, in our opinion, proves without a shadow of a doubt that CGI created a gimmick loan to fool investors into believing that it collected its outstanding Lease Shortfall Advances.

*At the closing of the Celadon Investment,*

*((i)) Celadon shall transfer, sell, and assign all of its interests in the Quality Assets to the Company;*

*(ii) Celadon shall transfer $31,800,000 in cash to an account designated by the Company, and the Company shall repay the Element Daylight Loan in full; (Subscription Agreement, 02/10/17)*

**(Emphasis in original).**

107. The April 5, 2017 *Seeking Alpha* article also noted that CGI's financial statements indicate that the Company had overstated its revenue and profits from equipment sales:

**Accounting Lever #2: Equipment Loss Concealed (TBV and Profits Inflated by $36m)?**

In its 8-K filed on 1/6/2017, CGI disclosed it received $56.7m in cash from Quality equipment sold to Element and another party at the JV closing. The company claimed it sold the equipment at book value. However, CGI's financial statements indicate this equipment was actually sold at a $36.0m loss. Therefore, we believe CGI further inflated its Q2'17 TBV and profits by $36.0m by failing to account for this loss.

**CGI claims it received $56.7m in cash from the sale of certain Quality equipment:** In its 8-K filed on 1/6/2017, CGI disclosed it received $57.8m in cash from the JV formation and related transactions. According to its disclosure, the company received $56.7m from Quality equipment sales (highlighted in the following table). In addition, CGI claimed it disposed of this equipment at a price close to book value:

***Equipment with net book value of approximately $162.5 million was disposed of*** *in connection with the Transactions. These assets were primarily recorded under equipment held for sale, leased assets held for sale, and leased assets.* ***The Company does not expect to record a significant gain or loss on disposition of this equipment.***[6] *CGI disposed of a total of $162.5m of Quality equipment in connection with the JV. Of which, $56. 7m was sold for cash, $63.6m was contributed to the JV and the remaining $42.4m was used as collateral to settle prior debts. (8-Kfiled on 1/6/2017)*

**Source and Use of Cash in Quality Equipment Sales**

| *($ millions)* | |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in 19th Capital at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**CGI financial statements indicated it collected only $20.7m in cash related to the sale of equipment**: CGI discloses the purchase and sale of Quality equipment in the operating cash flow statement in "leased revenue equipment held for sale."[7] *Included in net cash provided by operating activities is the change in leased and revenue equipment held for sale. The change in the account is made up of the net purchases and sales of equipment purchased only for the benefit of our equipment leasing and services segment. Note: "equipment leasing and services segment" relates to Quality.* In its Q2' 17 Cash Flow Statement, CGI recorded $20.7m of cash inflow related to its leased revenue equipment.

**Cash Flow From Leased Revenue Equipment Held For Sale**

| *($ millions)* | Q1' 17 | Q2' 17 |
|---|---|---|
| Leased revenue equipment | ($3.8) | $20.7 |

Sources: CGI 10-Q Cash Flow Statements Filed with the SEC

**CGI appears to have overstated the value of assets sold - TBV should have been $36.0m lower:** Based on CG I's Q2'17 Cash Flow Statement, it appears that the company only collected $20.7m in cash related from the sale of equipment in Q2' 17. Accordingly, we believe the sale price of Quality equipment was overstated by $36.0m.

**Loss On The Sale of Leased Revenue Equipment**

| *($ millions)* | Subscription Agreement | Prescient Point Estimates | Overstatement / (Understatement) |
|---|---|---|---|
| Cash received – redemption | $4.6 | $4.6 | $0.0 |
| Cash received – receipt of deferred purchase price cash | $6.7 | -- | -- |
| Cash received – sale of Quality equipment | $50.0 | -- | -- |
| Cash received for the sale of Quality Equipment | $56.7 | $20.7 | $36.0 |
| Cash received – reimbursement of Other Assets | $31.8 | $31.8 | $0.0 |
| Cash invested in JV at closing | ($35.3) | ($35.3) | $0.0 |
| Net cash received at closing | $57.8 | $21.8 | $36.0 |

*Prescience Point Estimates

Sources: CGI filings with the SEC

108. In response to the *Seeking Alpha* article, shares of Celadon fell 14.62 percent, or $0.85 per share, to close at $5.40 per share. The impact of the revelations in the article was

confirmed on April 5, 2017, by Reuters, which reported that "Celadon Group shares tumbled more than 20 percent on Wednesday after a short selling firm issued a report on the truckload freight company which said the stock was worth nothing."

109. On May 1, 2017, after trading had closed, CGI issued a press release entitled "Celadon Group Announces Corporate Updates" and filed the same on Form 8-K with the SEC, revealing, among other things, that the Company's auditor, BKD, LLP had withdrawn its reports on the Company's June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company relating to "transactions involving revenue equipment held for sale" and that those financial statements should no longer be relied upon:

> **Item 4.02 Non-Reliance on Previously Issued Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) and (b) On April 25, 2017, BKD, LLP ("BKD"), the independent auditors for the Company, informed the chair of the Audit Committee of the Company's Board of Directors (the "Audit Committee") that it was withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon. BKD advised the Company that additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June 30, 2016 financial statements and after the issuance of BKD's review reports on the Company's September 30, 2016 and December 31, 2016 interim financial statements. BKD further advised the Company that, in accordance with PCAOB Auditing Standard 2905, BKD had performed procedures to evaluate this information, including requesting explanations and supporting documentation from the Company's management. Based on the results of BKD's procedures, BKD advised the Company that ***BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports*** for the periods indicated above. As a result, as of May 1, 2017, the Audit Committee has concluded that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of BKD, should not be relied upon.
>
> The Audit Committee has discussed with BKD the matters disclosed under this Item 4.02. Based on these discussions, the Company understands the following: (i) BKD has not resigned as the Company's auditor; (ii) BKD has determined that it has not obtained sufficient appropriate audit evidence with respect to the

> revenue equipment held for sale transactions to determine that those transactions were properly recorded in accordance with GAAP; and (iii) BKD is prepared to review additional information, if any, and adjustments to the Company's financial statements, if any, and to then consider whether to re-issue the withdrawn reports.
>
> ***The insufficient appropriate audit evidence relates to the accounting (and related structure, substance, and disclosure) of transactions involving dispositions and acquisitions of revenue equipment between June and December of 2016 and the related carrying values.*** Additional information concerning the transactions and the fair values of the revenue equipment disposed of and acquired is required to determine the appropriateness of the accounting for these transactions. The need for additional information followed an Audit Committee request of BKD to perform additional procedures on the transactions prior to the normal audit cycle for fiscal 2017.
>
> The Company has provided BKD a copy of this Form 8-K and requested BKD to furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made in Item 4.02 of this Form 8-K, and, if not, stating the respects in which it does not agree. The Company has requested that BKD provide such letter as soon as possible, so that the Company can file such letter as an Exhibit to this Current Report on an amended Form 8-K within the time period prescribed by the Securities and Exchange Commission.

110. Also on May 1, 2017, the Company issued another press release entitled "Celadon Group Announces Corporate Updates" and filed the same on Form 8-K with the SEC, announcing that CGI's President and Chief Operating Officer ("COO), William Eric Meek, had resigned and that Jonathan Russel was appointed as President and COO in his stead. Following this news, a number of analysts changed their opinion on CGI to "Not Rated."

111. In response to the May 1, 2017 revelations, shares of Celadon fell 55 percent, or $2.20 per share, to close at $1.80 per share on May 2, 2017.

112. On May 3, 2017, Celadon held a live "Corporate Update" at 9:00 a.m. but, in a deviation from normal practice, did not accept analyst questions. During the conference call, Defendant Peavler stated:

> ***The review of the revenue equipment transactions was initiated by the Audit Committee to confirm and ensure proper accounting related to the preparation for and formation of the joint venture.*** At the relevant dates and during the relevant periods, we had hundreds of pieces of revenue equipment held-for-sale

> and we had numerous transactions to improve the profile of our leasing assets. We provided a significant amount of information concerning the transactions and the carrying values of the equipment to our auditor. However, as of April 25, our auditor advised us that it had concluded that more information was needed with respect to the transactions and carrying values. We've had several questions about the Audit Committee review process. I'll refer you to BKD's letter, which was specific in its reference, and also our press release. The Audit Committee is conducting a review of this matter with the assistance of independent counsel and one of the largest audit, tax and consulting firms in the world, and will provide an update when the review is completed. Given this process, management will not at this time make additional comment on this matter.
>
> ***There were a number of questions relating to the review and any potential impairment of revenue equipment held-for-sale, which was $45 million at June 30, 2016, and $29 million at September 30, 2016. Part of the Audit Committee process will include additional valuation analysis for support of the carrying values of the revenue equipment held-for-sale.*** If there are any changes that come from this evaluation, we would not expect any cash impact on Celadon, nor any impact on the collateral for our ABL facility. As well, all revenue equipment held-for-sale relating to those periods had been disposed of prior to December 31, 2016. If it is ultimately determined that any revisions are required, they will be made.

113. In response to the live Corporate Update, shares of Celadon fell 14.95 percent, or $0.25 per share, to close at $1.55 per share on May 3, 2017.

114. On May 8, 2017, CGI issued a press release and filed a Form 8-K informing investors that it had received notice from the NYSE notifying the Company of its failure to meet NYSE listing standards.

115. On July 3, 2017, in a Press Release filed on Form 8-K, CGI informed investors that it was deferring the release of financial results and that the scope of the Audit Committee review had expanded, noting:

> The Company currently expects to ***defer releasing financial results for the quarter ended March 31, 2017, and subsequent periods until the conclusion of the previously announced audit committee process. The reissuance of past financial statements could include adjustments to previously released financial results and recorded balances.*** As previously disclosed, the financial results for the March quarter are expected to include a net loss. As part of its annual review of the carrying value of intangible assets, the Company is evaluating goodwill. The Company believes the evaluation, when completed, may result in a noncash

> impairment charge of up to the full carrying value of $62.4 million pretax. An adjustment to the carrying value of goodwill could be reflected in the March period because those financial statements are under review.

116. In the same Press Release, CGI also announced that it expected to record a pretax equity loss from its interest in 19th Capital II of approximately $7.8 million for the March quarter and expected an additional equity loss in the June quarter.

> In addition, the Company expects to record ***a pretax equity loss from minority interest in joint venture of approximately $7.8 million for the March quarter, and an additional equity loss for the June quarter is expected.*** An evaluation of the carrying value of the minority investment in joint venture may occur in connection with issuance of the Company's outstanding financial statements or other triggering events.

The equity loss of $7.8 million recorded just three months after the formation of 19th Capital II indicates that the carrying value of equipment held for sale and other assets contributed to the JV were overvalued at formation, as indicated by the *Seeking Alpha* article published on April 5, 2017.

117. On July 13, 2017, in a Press Release, CGI informed investors that Defendant Will was "retiring" as CEO and Chairman of the Board. Defendant Will was replaced by Paul C. Svindland as CEO. On July 19, 2017, in a Press Release filed on Form 8-K, CGI informed investors that Defendant Will, as part of his separation agreement, would be forfeiting all of his unvested equity grants, with the exception of 75,000 shares of restricted stock that were granted on January 29, 2016. Defendant Will forfeited 40,100 unvested equity grants, valued at $160,400, based on Celadon's stock closing price of $4.00 on July 19, 2017.

118. Element released a press release on August 10, 2017, titled "Element Fleet Management Provides Q2 2017 Results on Newly Segmented Basis and Announces Intention to Launch Normal Course Issuer Bids for Preferred Shares and Debentures." Therein, Element disclosed that the carrying value of its interests in 19th Capital II was $81.4 million, or $65.17

million, representing a 35 percent decline in the carrying value of 19th Capital II over the past six months, further indicating that the carrying value of equipment held for sale and other assets contributed to the JV were overvalued at formation, as indicated by the *Seeking Alpha* article published on April 5, 2017. In the press release, Element further disclosed:

> **Update on the non-core 19th Capital Group LLC joint venture**
> In Q2 2017, Element recorded a loss of $10.9 million before tax from its interest in the noncore 19th Capital Group LLC joint venture. This operating loss comprised of $8.2 million in operating losses and the remaining $2.7 million was related to losses on sale of equipment during the quarter. For H1 2017, the operating loss before tax was $21.1 million. In addition, the Company recorded a $30 million reserve against certain assets of the joint venture, which also serves to reduce the carrying value of its equity stake in the joint venture . . . .

119. On September 14, 2017, CGI filed a Notification of Late Filing for its FY2017 financial results. Therein, CGI disclosed that its auditor was not performing its normal audit procedures with respect to CGI's annual report on Form 10-K for the fiscal year ended June 30, 2017:

> As Celadon Group, Inc. (the "Company") previously disclosed, the Company's auditor, BKD, LLP ("BKD"), advised the Company it has determined that, based on additional information concerning transactions involving "revenue equipment held for sale," BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports on the Company's financial statements for its fiscal year ended June 30, 2016 and the quarters ended September 30, 2016 and December 31, 2016. The Audit Committee of the Company's Board of Directors is continuing to review this development. ***In addition, BKD is not performing its normal audit procedures with respect to the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2017.*** These events have resulted in time and resource constraints on the Company's accounting staff and Audit Committee, including the evaluation of any potential additional disclosures and financial statement impacts that need to be reflected in the Form 10-K. Accordingly, the Company's filing of its Annual Report on Form 10-K for the fiscal year ended June 30, 2017, will be delayed.

120. On October 2, 2017, in a Press Release, CGI informed investors that the SEC had undertaken a formal investigation into the Company and that CGI had received a subpoena from the SEC and was in the process of producing documents to the SEC pursuant to the subpoena.

CGI also noted that it did not expect to issue audited financial statements or report financial results in compliance with GAAP for FY2016, or any subsequent period, before December 31, 2017.

121. On October 16, 2017, in a Press Release, CGI announced that Defendant Peavler had been replaced as CFO and Principal Accounting Officer by Mr. Albrecht.

122. On April 2, 2018, after trading had closed, CGI issued a press release entitled "Celadon Group to Restate Prior Financial Statements; Announces Credit Agreement Amendment and Operations Update" and filed the same on Form 8-K with the SEC, providing, among other things, that the Company's internal investigation had identified errors, which would vastly expand the scope of the Company's restatement to include the previously issued "2014, 2015, 2016, and 2017 financial statements (and potentially periods prior thereto)."

123. The April 2, 2018 press release further stated that "the Company presently expects adjustments to the following":

- Equipment Held for Sale Transactions. The internal investigation has revealed transactions involving revenue equipment held for sale by the Quality Companies subsidiary that included **undisclosed arrangements that overstated the values of equipment traded in those transactions.** Pursuant to these transactions, the Company sold to counterparties equipment at above market prices and **in return the Company paid amounts substantially in excess of the fair value of equipment purchased from those counterparties.** Additionally, the written agreement governing certain of these transactions with a particular counterparty **omitted material, agreed upon terms in order to enable the Company to account for those transactions as separate, independent purchases and sales, notwithstanding that they had not been negotiated as such and the stated values of a significant portion of the traded equipment was not at arm's-length values.** Based on this information, the Company performed additional procedures to determine the fair value of equipment both purchased and sold and **concluded that a write down of carrying values of revenue equipment held for sale of approximately $20 million is appropriate at June 30, 2016.** The carrying values of this equipment will be restated to reflect management's determination of fair values at the relevant periods, **which may include dates prior to June 30, 2016.** The adjustment will be non-cash, and no future

impact to the carrying value of this equipment is expected because all of the affected equipment was disposed of or contributed to the 19th Capital Group, LLC ("19th Capital") joint venture prior to December 31, 2016.

- <u>Element Transactions</u>. The Company determined that **equipment transactions with Element Financial Corp. and its affiliates ("Element") and 19th Capital** (prior to its recapitalization on December 30, 2016), **did not sufficiently transfer the risks of ownership to qualify for sales accounting.** Instead, the Company should have recorded such transactions as borrowings due to the terms of the relevant agreements, including amendments, and the manner in which the Company administered the Element transactions. Under borrowing accounting, the Company would continue to recognize equipment assets on its books and would reflect the proceeds received from Element and 19th Capital as financing obligations. The assets would continue to be depreciated, the payments would be recorded as a reduction of obligations and an increase to interest expense, amounts collected from lessees would be recorded as revenue and payments for maintenance would be expensed. The Company expects to record non-cash adjustments for the affected periods: fiscal 2014, fiscal 2015, fiscal 2016, and the first two quarters of fiscal 2017. At the end of the second quarter of fiscal 2017, borrowing treatment would cease due to the contribution of the relevant assets and liabilities to 19th Capital on December 30, 2016.

    - The balance sheet adjustments relating to these transactions are expected to result in an increase in reported asset values in our statements of financial position totaling approximately $500 million for the three-year period ended June 30, 2016. Adjustments related to liabilities are expected to result in an increase in reported values in our statements of financial position totaling approximately $700 million for the three-year period ended June 30, 2016. Adjustments for both assets and liabilities for the first two quarters of 2017 are still under review.

    - **The income statement impacts relating to these adjustments are expected to reduce net income before income taxes by a range of $200-$250 million cumulatively over the three-year period ended June 30, 2016.** In addition to considering the impact on these periods, the Company is reviewing the impact for the first two quarters of 2017.

    - The reversal of borrowing accounting at December 30, 2016, is expected to remove all of the assets and liabilities described above from the balance sheet and result in a significant non-cash gain due to the elimination of liabilities in excess of assets. The amount of the gain is still under review and will be offset in part by the amount by which the opening recorded value of the Company's equity investment in 19th Capital is adjusted below $100 million as discussed below.

- 19th Capital Investment. On December 30, 2016, the Company and Element Transportation, LLC ("Element Transportation") each contributed certain assets to 19th Capital and, in exchange, each received approximately 49.9% of the equity interests in 19th Capital. Element Transportation contributed its beneficial interests in certain fleet assets, the associated lease agreements, and cash, which was immediately applied to pay down the outstanding principal balance of loans made by Element Transportation to 19th Capital. Element Transportation also made a daylight loan to 19th Capital in the amount of $31.8 million, which was used to satisfy an outstanding payable obligation to the Company. The Company contributed certain assets held for sale, leasing assets, and cash. Based upon adjustments related to equipment held for sale, including those noted above, the original $100 million recorded value of the Company's initial contribution to 19th Capital at its December 30, 2016 inception will be reduced. The Company is evaluating whether any further adjustment for items other than equipment values is appropriate. The expected total adjustment will relate to the fair values of the assets, liabilities and equity of 19th Capital contributed by both the Company and Element Transportation, the assets and liabilities retained by 19th Capital, as well as aspects of the accounting for the recapitalization of 19th Capital. The restated carrying value of the equity investment as of December 31, 2016, coupled with net losses of 19th Capital subsequent to December 31, 2016, may result in a reduction of the Company's equity method investment to as low as zero.

- Lease Classification. The Company determined that **a portion of the Company's equipment leases currently accounted for as operating leases should be restated as capitalized leases primarily due to the default and cross default provisions in such agreements.** The affected periods include fiscal 2014, fiscal 2015, fiscal 2016, and the first two quarters of fiscal 2017, and some of such leases remain in effect. The impact on net income in any given period is not expected to be significant. The impact on stockholders' equity is not expected to be significant because the recorded assets and liabilities are expected to be approximately equal. The adjustment to assets and liabilities in our statements of financial position are expected to total approximately $150 million for the three-year period ended June 30, 2016.

- Other. The Company is reviewing other accounting areas in each affected period as part of the financial restatement issuance process. Additional items identified to date and presently under review include: (1) carrying values of, and depreciation policies applicable to, tractors and trailers used in operations, (2) reserves applicable to claims and accounts receivable, (3) foreign currency gains and losses, (4) potential impairments of property, plant and equipment related to the Element transactions, and (5) the Company's deferred income tax liability in light of the various adjustments. **Any adjustments associated with these issues could be material and some of them may impact current and future periods**.

The anticipated adjustments identified above are subject to ongoing review

> and analysis and cannot be precisely quantified with respect to any period at this time. However, the cumulative effect of the adjustments, along with operating losses and other expenses since the Company's last filed financial reports, **are expected to reduce its reported stockholders' equity materially. The adjustments are also expected to have a material impact on assets, liabilities, revenue, income (loss), and individual expense items in certain periods.**

124. In addition, the April 2, 2018 press release disclosed that the Company had material weaknesses in its internal controls over financial reporting for 2014 through 2016:

> Due to the restatement issues identified above, on April 2, 2018, the Audit Committee and the Company's management concluded that **the annual financial statements for the Company's 2014 and 2015 fiscal years, the unaudited quarterly reports issued during such periods, and the unaudited quarterly reports issued during fiscal 2016, should no longer be relied upon.** In addition, the Company has concluded that **there were deficiencies in its internal control over financial reporting that constituted material weaknesses for each of the affected periods and, as a result, management's reports on its internal control over financial reporting as of June 30, 2014, June 30, 2015, and June 30, 2016, should no longer be relied upon.** The Company has engaged outside advisors to assist in remediating deficiencies in its internal control over financial reporting.

125. In response to the April 2, 2018 press release, CGI shares plummeted more than sixty percent to close at $1.35 on April 4, 2018.[6]

126. Thus, every single statement made during the Class Period as referenced in Section V, infra, concerning the value of assets on CGI's books or in Quality's portfolio, as well as every single assurance of the effectiveness of CGI's internal control over financial reporting and accompanying certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), were false and misleading.

## V. Materially False And Misleading Statements Made During the Class Period

127. The Class Period begins on October 29, 2013, when CGI issued a press release and filed the same on Form 8-K with the SEC entitled "Celadon Group Reports September

[6] The NYSE suspended trading in Celadon Stock prior to the market opening on April 3, 2018. Trading resumed on the over-the-counter market on April 4, 2018.

Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended September 30, 2013. Therein, Defendant Will reported that "***Our balance sheet remains solid and we retain significant liquidity to support the growth of our business.***" CGI's balance sheet further reported ***$7.7 million of "Equipment held for resale" under its "current assets," $665.3 million in total assets, $431.1 million in total liabilities,***[7] ***as well as $6.6 million in net income.***

128. On November 12, 2013, CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended September 30, 2013, providing the Company's consolidated financial results for that period summarized in the Company's October 29, 2013 press release, including that CGI's assets included ***$7.7 million of "Equipment held for resale," $665.3 million in total assets, $431.1 million in total liabilities, and also reported $6.6 million in net income.***

129. The Company's November 12, 2013 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting.

> **Item 4. Controls and Procedures**
>
> **Evaluation of Disclosure Controls and Procedures**
> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management

---

[7] Celadon's financial statements do not contain a separate line item on its balance sheets for "total liabilities" and instead reports "total liabilities and stockholders' equity." The "total liabilities" figures herein are calculated by deducting "total stockholders' equity" (which is included as a separate line item) from "total liabilities and stockholders' equity."

recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

Prior to the filing of our Annual Report on Form 10-K for the fiscal year ended June 30, 2013, our management, under the supervision and with the participation of our Certifying Officers, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (the "Evaluation") as of the last day of the period covered by such filing.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

130. The Company's November 12, 2013 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, who certified:

1. I have reviewed this Form 10-Q of Celadon Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those

entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

131. On January 31, 2014, CGI issued a press release and filed the same on Form 8-K with the SEC, entitled "Celadon Group Reports December Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended December 31, 2013. Therein, the Company reported that "***Our balance sheet remains solid and we retain significant liquidity to support the growth of our business.***" CGI's balance sheet further reported ***$6.7 million in "Equipment for resale" under its "current assets," $730.1***

***million in total assets, $492.2 million in total liabilities, and also reported $5.1 million in net income***.

132. On February 10, 2014, CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended December 31, 2013, providing the Company's consolidated financial results for that period summarized in the Company's January 31, 2014 press release, including that CGI's "current assets" included ***$6.7 million in "Equipment for resale," $730.1 million in total assets, $492.2 million in total liabilities, and also reported $5.1 million in net income***.

133. The Company's February 10, 2014 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

134. The Company's February 10, 2014 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, substantially similar to the certifications described in ¶130, *supra*.

135. On April 30, 2014, CGI issued a press release, and filed the same on Form 8-K with the SEC, entitled "Celadon Group Reports March Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended March 31, 2014. In part, CGI reported ***$4.1 million in "Equipment for resale" under its "current assets," $691.6 million in total assets, $452.7 million in total liabilities, and also reported $3.5 million in net income***.

136. On May 12, 2014, CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended March 31, 2014, providing the Company's consolidated financial results for that period summarized in the Company's April 30, 2014 press release, including that

CGI's assets included ***$4.1 million in "Equipment for resale," $691.6 million in total assets, $452.7 million in total liabilities, and also reported $3.5 million in net income***.

137. CGI's May 12, 2014 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

138. CGI's May 12, 2014 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, substantially similar to the certifications described in ¶130, *supra*.

139. On August 7, 2014, CGI issued a press release, and filed the same on Form 8-K with the SEC, entitled "Celadon Group Reports June Quarter and Full Fiscal Year Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended June 30, 2014. In part, CGI reported ***$3.1 million in "Equipment for resale" under its "current assets," $690.8 million in total assets, $431.8 million in total liabilities and also reported $30.7 million in net income for fiscal 2014***.

140. On September 15, 2014, CGI filed with the SEC its annual report on Form 10-K for the fiscal year ended June 30, 2014, reporting among other things ***$3.1 million in "Equipment for resale" under its "current assets," $690.8 million in total assets, $431.8 million in total liabilities, and also reported $30.7 million in net income***.

141. CGI's September 15, 2014 Form 10-K also falsely assured investors of the effectiveness of CGI's internal control over financial reporting:

> **MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2014, using criteria established

> in *Internal Control-Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In making this assessment management used the criteria set forth by COSO in *Internal Control—Integrated Framework (1992)*. Based on this assessment, our management has concluded that as of June 30, 2014, our internal control over financial reporting is effective based on those criteria.
>
> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.
>
> The effectiveness of our internal control over financial reporting as of June 30, 2014 has been audited by BKD LLP, an independent registered public accounting firm, as stated in their attestation report. See "Financial Statements and Supplementary Data" under Item 8 of this Annual Report on Form 10-K for BKD LLP's attestation report.
>
> **CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

142. CGI's September 15, 2014 Form 10-K was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, substantially similar to the certifications described in ¶130, *supra*.

143. On October 29, 2014, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports September Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended September 30, 2014. In part, CGI reported ***$3.1 million in "Equipment held for resale" under its "current assets," $743.0 million in total assets, $478.8 million in total liabilities, and also reported $8.0 million in net income***.

144. On October 30, 2014, CGI held a conference call to discuss financial and operating results for the period ended September 30, 2014. During the call, Defendant Will stated:

> Gain and disposition of equipment of $4.6 million compared with prior year of $1.2 million is comprised of two components: The first is related to the gain and normal disposition of equipment operated in the Celadon fleet of approximately $2 million. ***The remaining $2.6 million is related to our efforts of expanding our quality equipment sales entity. Quality equipment sales has historically been focused on maintaining and disposing of Celadon assets. Recently, it has expanded its focus to include acquiring and disposing assets outside of Celadon's normal operation. As a result, we expect the total gain on disposition of equipment run rate to increase to approximately $5 million to $7 million in the December 2014 quarter.***

145. Defendant Will also answered questions from analysts:

> **Brad Delco** Stephens Inc. – Analyst
> Paul, can you talk a little bit about those gains on sale? I heard your $5 million to $7 million expectation for the calendar of fourth quarter. How do you expect that to trend longer-term? I mean, is this going to be kind of a recurring event that we see now because of the way that you're set up with that business? Or is this probably just a little bit higher because of the amount of equipment you're kind of moving in and out because of these acquisitions?
>
> **Paul Will** Celadon Group – President, CEO
> Yes, good question. ***So what we're trying to point out is that, when we did our transaction with the element last year in May -- March, our whole goal was to make those truly independent contractors to not lease purchase trucks. That gave us a funding mechanism in place so that we could expand we've done and not carrying the debt on Celadon's books.*** So as a result, we've expanded our, basically, offering to fleets outside of just disposal of Celadon equipment and have actually purchased other equipment to dispose of -- to basically defray -- the initial intent was just to defray costs, both using our service center network to provide services, parts and service on other trucks, as well as then, if we were to sell additional trucks to keep those facilities operating to reduce the cost to Celadon.
>
> So as we look forward, obviously, we want to break out the difference between what you'd see is a normal general refresh of Celadon equipment and then what's being done separate and distinct from that. We think that the run rate on Celadon go-forward basis probably for the next 12 months based on our refresh cycle expectations is, probably, maybe $2 million a quarter, which is similar to what we came in this quarter and similar to what we had given guidance on last quarter.

> ***On a go-forward basis, we expect, actually, the quality side of it independent of disposal of Celadon equipment to continue to grow from here.***
>
> ***We don't -- we haven't laid out exactly since it's fairly new to us as far as expanding what we're doing. We haven't really laid that out. But our expectation is, based on what we see today, $5 million to $7 million, and that we do see that potentially ramping up thereafter based on the infrastructure we're putting in place beyond just supplementing the disposition of Celadon equipment. So we do see that continuing. I know it's a long-winded answer, but yes, we see that continuing to improve or increase over time.***

146. On November 10, 2014, CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended September 30, 2014, providing the Company's consolidated financial results for that period summarized in the Company's October 29, 2014 press release, including that CGI's assets included ***$3.1 million in "Equipment held for resale," $743.0 million in total assets, $478.8 million in total liabilities, and also reported $8.0 million in net income***.

147. CGI's November 10, 2014 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

148. CGI's November 10, 2014 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, substantially similar to the certifications described in ¶130, *supra*.

149. On January 28, 2015, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports December Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended December 31, 2014. In part, CGI reported ***$26.3 million in "Equipment held for resale" under its "current assets," $875.6 million in total assets, $608.1 million in total liabilities, and also reported $8.5 million in net income***.

150. On January 29, 2015, CGI held a conference call to discuss its financial and operating results for the period ended December 31, 2014. During the call Defendant Will stated:

> Owner-operators increased by 110 tractors, 719 last year to 829 this December 2014 quarter, an increase by 238 sequentially from 591 in the September 2014 quarter. Owner-operator miles increased by 2.5 million from 18.9 million last year to 21.5 million this December 2014 quarter. Intermodal revenue decreased by 1.1 million from 9.7 million last year, to 8.6 million in the December 2014 quarter. The decrease was attributable to customer service operating changes. We expect to trend to be back up in coming quarters. Asset Light revenue increased in the December 2014 quarter to 21.8 million from 14.4 million last year, or an increase of 7.7 million including approximately $5 million from operations of A&S Kinard. Next I would like to address some expenses incurred in the December 2014 quarter. Fuel expense declined in the quarter due in part to the price reductions at the pump, as well as fuel efficient equipment that has been brought onto the fleet from our equipment refresh since last year. The $0.08 EPS improvement year-over-year in fuel expense was split approximately half between decreased price and about half from improved fuel economy on the refreshed fleet. Sales and wages and employment benefits increased year-over-year, but are comparable on a percentage of revenue basis, both sequentially and compared to prior year. The primary drivers of the increase were a result of higher recruiting costs and medical insurance benefits, both increasing by approximately $1 million over the prior year. The increased expense associated with recruiting expense experienced drivers has continued due to challenging driver market. Our efforts on this front are beginning to show benefits in the current March quarter and our season count increased organically during the month of January. As everyone is aware, medical benefits continue to be a challenge with all of the changes we have been experiencing. However, we believe our efforts on the employee wellness front should help curb further increases in the future.
>
> We continue to experience positive benefits from our driving school. Through our driving school roll out, it has allowed us to grow our seat count from graduating students to approximately 1515 currently in the fleet, up from 470 in the September quarter. We currently have four schools operating, and we are in the process of adding three additional locations. We expect this to help us continue to organically grow our fleet count over time. Insurance and claims was negatively impacted by some unusual workers compensation expense activity, which impacted earnings in the quarter by approximately $0.02. We believe this will trend back down to $0.06 to $0.065 cost per mile range in future quarters.
>
> I would like to give a brief update on the acquisition of A&S Kinard. The transition has gone smoothly, and it has generated positive results in the current quarter. ***Revenue for the quarter is approximately $27 million, pretax income was approximately $1.8 million***, and fuel adjusted operating ratio for the division was 91.4%. We believe there will continue to be sales and operational synergies between Celadon and the A&S Kinard Group in future quarters.

I would like to give a brief update on our other most recent acquisition of Taylor Express. As we stated in an earlier press release, we plan to have the present management team in place and continue to operate independently under the Taylor name and personnel, similar to the transaction that we did with A&S. Taylor operates approximately 190 trucks, 840 trailers, and generates approximately $38 million in revenue, including the 840 trailers, are approximately 240 specialized dry bulk trailers, in addition to the 600 drive van trailers. This acquisition should bring cost savings and sales synergies between the two companies, but we are most excited about the acquisition due to the growth opportunities in the dedicated dry bulk business. We expect the transaction to be accretive beginning in the first quarter of calendar year 2015, and an annual accretion of $0.10 to $0.15. I would now like to open the phone to questions.

151. Defendant Will also answered questions from analysts:

**Thom Albrecht** BB&T Capital Markets – Analyst
Hi, guys. Nice to be back in the positive earnings growth these last couple of quarters. I had a question from your balance sheet. On the equipment held for sale of $26.33 million, is that just trucks in the core Celadon fleet, or does that include the quality effort that sort of is the market place at large?

**Paul Will** Celadon Group, Inc. – President, CEO
***It is pretty much all quality equipment. When we look at that, that is running around a 45-day inventory. As we look at our debt balance, we take cash out of our debt balance and we also take that $26 million is what is really consider what is really truly debt associated with the operating business.***

152. On February 9, 2015, CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended December 31, 2014, providing the Company's consolidated financial results for that period summarized in the Company's January 28, 2015 press release, including that CGI's assets included ***$26.3 million in "Equipment held for resale," $875.6 million in total assets, $608.1 in total liabilities, and also reported $8.5 million in net income***.

153. CGI's February 9, 2015 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

154. CGI's February 9, 2015 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, substantially similar to the certifications described in ¶130, *supra*.

155. On April 28, 2015, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports March Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended March 31, 2015. In part, CGI reported ***$41.3 million in "Equipment for resale" under its "current assets," $961.6 million in total assets, $688.6 million in total liabilities, and also reported $8.6 million in net income***.

156. On May 11, 2015, CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended March 31, 2015, providing the Company's consolidated financial results for that period summarized in the Company's April 28, 2015 press release, including that CGI's assets included ***$41.3 million in "Equipment for resale," $961.6 million in total assets, $688.6 million in total liabilities, and also reported $8.6 million in net income***.

157. CGI's May 11, 2015 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

158. CGI's May 11, 2015 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Will, substantially similar to the certifications described in ¶130, *supra*.

159. On July 29, 2015, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports June Quarter and Full Fiscal Year Results and Declares Dividend," summarizing the Company's financial and operating

results for the period ended June 30, 2015. In part, CGI reported ***$99.8 million in "Equipment for resale" under its "current assets," $1.2 billion in total assets, $806.9 million in total liabilities, and also reported $37.2 million in net income for fiscal 2015***.

160. On July 30, 2015, CGI held a conference call to discuss its financial and operating results for the fiscal year ended June 30, 2015. During the call, Defendant Will stated:

> ***We have continued to see positive results from the growth of our Quality equipment division. In addition to the equipment sales and leasing aspect of the business, we are beginning to see nice traction in our other business service offerings, which includes tax services, insurance, parts, and maintenance. Approximately 15% of the equipment sold during the quarter was equipment disposed of from the Celadon fleet. The $9.5 million in gain on sale of equipment, which is net of trade expenses, was entirely from the sale of third-party equipment.***
>
> ***With the growth of this division, the current operating expense associated with running this entity was approximately $4 million for the quarter. Therefore, the operating income related to our sales and leasing division was approximately $5.5 million for the quarter. As Celadon has completed its tractor refresh cycle, we expect all gains going forward to be related to third-party sales and leasing and amounting to approximately $10 million to $12 million for the September quarter***.
>
> I'd like to address our current leverage position. ***Due to significant growth of our Quality division, approximately $100 million of our current balance sheet debt reflects assets held for sale. This amount represents approximately 45 days of equipment inventory based on the current sales and leasing levels, which we expect to increase in subsequent quarters. In addition, there's approximately $50 million of equipment on the balance sheet related to the expedited refresh of the Celadon fleet, which we expect to come out over the next six months***.

161. Defendant Will also answered questions from analysts:

> **Brad Delco** Stephens, Inc. – Analyst
> No, that makes sense. And then, final question, just again on your comments. It seems as if you now have ramped to, call it, your 45 days of inventory with Quality. Does that mean debt level probably at this point is maxed out and with the $150 million of assets you have for sale we should see debt go down from here? Or how should that trend?
>
> **Paul Will** Celadon Group, Inc. – President & CEO
> Yes. So, I think -- so, there's two real pieces to it. So, we've refreshed our entire fleet pretty quickly. You see our average age has gone from 1.8 last year to 1.2.

> But, more specific, I think, if you look at the last couple quarters we were a size 2.2. So we've brought down rapidly as well as are currently in the major refresh for our trailers. So, the tractors are done. Through moving around equipment to the different divisions, we probably have about $50 million between the trucks and trailers that we believe will come out over the next six months, or the majority will come out over the next six months.
>
> ***The $100 million as it relates to the Quality entity, I think what you're going to see is that that will probably reside there. It may end up going up between now and the end of the year, being December. So, what you may see is the $50 million will come out, but we may need maybe another $25 million or $50 million for the Quality and we'll have to obviously update that as each quarter goes by, depending on the levels and how the business is growing. But I think you should see it come down some, but you're not going to see it come down $150 million, which is what we were trying to really identify in the press release and then in the script as well.***

162. On September 10, 2015, CGI filed with the SEC its annual report on Form 10-K for the fiscal year ended June 30, 2015, reporting among other things ***$102.4 million in "Equipment held for resale" under its "current assets," $1.2 billion in total assets, $809.3 million in total liabilities, and also reported $37.2 million in net income***.

163. CGI's September 10, 2015 Form 10-K also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

164. CGI's September 10, 2015 Form 10-K was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

165. On October 2, 2015, CGI announced the formation of the 19th Capital I and related agreements between Quality and the 19th Capital I. On that day, CGI issued a press release and filed the same on Form 8-K with the SEC entitled "Celadon Group, Inc. Announces Sale of Tractor Portfolio, Joint Venture to Grow Quality Companies Segment," summarizing the transaction:

> Celadon Chairman and CEO, Paul Will, commented: "At Celadon, we continue to seek growth opportunities that diversify our income streams, participate in rapidly growing and defensible markets and improve our return on capital. I am pleased to announce another important step in this direction through a portfolio sale and financing joint venture to support the growth of our Quality Companies subsidiaries. ***We recently completed the initial sale of an approximately $13.6 million portfolio of tractors and the associated leases to 19th Capital Group LLC***, and additional portfolio sales are expected to take place in the future.
>
> . . .
>
> Will continued . . . "***The historical arrangement with our financial partner has been positive***, and we expect it to continue. However, due to the significant growth of Quality and with the additional capacity needed to grow fully with Quality Companies, we believe it is in our best interest to diversify our sources of growth capital and encourage competitive terms. Accordingly, we have been seeking additional financial partners."
>
> . . .
>
> Will addressed the portfolio sale: "***We sold a portfolio to 19th Capital Group for approximately $13.6 million***. In addition, we agreed to provide certain driver recruiting, lease payment remittance, maintenance and insurance services under related agreements. We anticipate additional sales to 19th Capital Group in the future. The services and terms of these services are similar to those provided to our current financing partner."

166. On October 29, 2015, CGI issued a press release and filed the same on Form 8-K with the SEC entitled "Celadon Group Reports September Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended September 30, 2015. Therein, Defendant Will reported that "***Our balance sheet remains solid, and we retain significant liquidity to support the growth of our business.***" CGI's balance sheet further reported ***$175.1 million in "Equipment held for resale," $1.3 billion in total assets, $894.2 million in total liabilities, and also reported $11.4 million in net income***.

167. On October 29, 2015, CGI held a conference call to discuss its financial and operating results for the period ended September 30, 2015. During the call, Defendant Will stated:

***We have continued to see positive results from the growth of our sales and leasing position. In addition to the equipment sales and leasing aspect of the business, we are beginning to see a nice traction in our other business service offerings, which includes tax services, insurance, parts and maintenance. The $13.2 million in gain in the quarter on sales equipment, which is net of any trade expenses, was primarily from third party sale of equipment.***

. . .

***Due to the significant growth of our Quality division, approximately $175 million of our current balance sheet debt reflects assets held for sale. This amount represents approximately $25 million of equipment inventory and $150 million of assets that are under lease to third parties***.

. . .

168. Defendant Will also answered questions from analysts:

**Todd Fowler** - KeyBanc Capital Markets – Analyst
I think Brad went through a couple of the things that investors are concerned about with the story. But I know, Paul, one of the other questions that we've been getting is just around the exposure to the used truck market. And I know that the way the Quality companies' business is set up is that you don't carry a significant amount of risk in reselling equipment. But can you just walk through the exposure that you have to both the softer used truck market as it relates to that business.

And then one of your quasi-competitors was out and they were talking about some charges that they were taking related to lease guarantees. And maybe if you can get people comfortable with how you don't have exposure related to residual guarantees on some of the equipment that's going through on the Quality side.

**Paul Will** - Celadon Group, Inc. - Chairman, CEO and Director
***Yes, we don't have any residual guarantees, so that's not an issue.*** In the script that I went through earlier, ***I tried to address that question which is of the $175 million that's in equipment held for resale, approximately $150 million of that is already, in essence, on lease to be sold off, if you will. So therefore, we don't really have any exposure necessarily to a declining equipment market.*** Now what you do have in a declining equipment market, and what we found back in the 2008/2010 timeframe was that you're still going to lease the piece of equipment for a certain amount of money regardless of the price. ***So, if the equipment market does decline somewhat, it allows us to buy at a lower price, and therefore really positively impacts the margin more so than negatively impacts it. So, neither of those are issues that we have in the model that we have today.***

. . .

**Tom Albrecht** - BB&T Capital Markets – Analyst
Okay. And then of the $25 million -- so the $150 million, $25 million is what, just stuff that has not found a lease yet? So just beginning that remarketing process?

**Paul Will** - Celadon Group, Inc. - Chairman, CEO and Director
Yes. It's in process. You're always going to have a certain amount of equipment that's in process, and you're exactly right that that's what that represents. And that's why our point is there's not a lot of exposure on the used equipment because we don't have a lot of used equipment to sell or lease at this point. And then if we have to go in the market to buy used equipment, we'll obviously be buying at lower prices if the market has declined, which is has somewhat.

. . .

**Scott Group** - Wolfe Research – Analyst
Okay. And then I know there's been a bunch of questions about Quality already, but is there not some cyclical element to this business in a falling Class 8 market or in an economic downturn kind of environment? Should we not think about this as a cyclical business?

**Paul Will** - Celadon Group, Inc. - Chairman, CEO and Director
Well we've -- we found that we actually grew the business. It was on a smaller scale. We grew the business in the 2009/2010 timeframe, based on fleets looking to get additional capacity without having to invest CapEx. So we actually grew this business in that timeframe. At the time, we were only investing about $60 million into it. So as used truck prices went down, your investment's less. So the number of trucks we had in it went from about 600 to 700 to about 1,400 in that timeframe.

Subsequent to that, if you look in the call it 2012, 2013 timeframe, we had significant gains come through from the sale of that equipment, and you can see that in our financials.

***So, we believe it's not as a downturn is. It is, in some respects, almost better for the business than the steady state or a growing economic environment. So as it stands right now, we believe it's -- either way, the business should be successful.***

169. On November 9, 2015, CGI filled with the SEC its quarterly report on Form 10-Q for the three-month period ended September 30, 2015, providing the Company's consolidated financial results for that period summarized in the Company's October 29 press release, including that CGI's assets included ***$175.1 million of "Equipment held for resale," $1.3 billion in total assets, $894.2 million in total liabilities, and also reported $11.4 million in net income***.

The 10-Q further provided that "***We are not obligated to make payments in respect of the leases or financing provided by the Quality Financing Parties [(Element or the 19th Capital I)] to the independent contractors or fleets***," and further reported that:

> ***Gains on the disposition of equipment increased from $4.6 million in the first quarter of fiscal 2015, to $13.2 million in the first quarter of fiscal 2016. The increase is due primarily to the equipment that we sold to Element. We expect gain on sale to decrease over the next few months related to the holiday season and then continue to grow subsequently, although gain on sale can vary significantly due to a variety of factors, including our ability to grow Quality, availability of replacement equipment and conditions in the new and used equipment markets.***

170. The Company's November 9, 2015 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

171. The Company's November 9, 2015 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

172. On January 27, 2016, CGI issued a press release, and filed the same the following day on Form 8-K with the SEC, entitled "Celadon Group Reports December Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended December 31, 2015. Therein, Defendant Will reported that "***Our balance sheet remains solid and we retain significant liquidity to support the growth of our business.***" CGI's balance sheet further reported ***$49.3 million in "Leased revenue equipment held for sale" and $81.0 million in "Revenue equipment held for sale" under its "current assets." The Company also reported $1.2 billion in total assets, $800.3 million in total liabilities, and $6.6 million in net income.***

173. On January 28, 2016, CGI held a conference call to discuss its financial and operating results for the period ended December 31, 2015. During the call, Defendant Will stated:

> **Paul Will** - Celadon Group Inc – CEO - Yes. As far as the quality business, I think as in the transcript as read. Typically in the fourth quarter, you typically have the holidays and see the same number of trucks that you do during the rest of the year, so our actual income in that division was comparable year-over-year. Right now, we are not in the process or contemplating selling that division. So I know there's been - some calls have come in asking what our plans are, and what we do, our comments have been the same as if someone came in and offered something, we would look at anybody that want to entertain something, but at this point in time, we're not actually pursuing a sale of that business. ***So we look at that business as you've got some assets on the books that are continuing to be leased out, of the $130 million, you got about $50 million that's already leased***. ***And then we have funding sources in place that what we do is we release that equipment and then we sell off those leases to various funding sources. And we've got funding capital in place throughout the next 12 months that is more than adequate to continue to have that balance go down. On a go-forward basis, once that equipment of resale is depleted that we expect within the next three to six months, the funding sources are laid out, so that we will not be adding additional debt into that same facet. Selling them will not be a conduit for it, those leases will be done directly with the financing sources. And therefore avoiding some of the, I think, cloudiness if anything that has been put on the Celadon stock relative to what are these big numbers that are going to be write-off or anything like that.***

174. Defendant Will also answered questions from analysts:

> **Aaron Reeves - BB&T Capital Markets – Analyst** - Okay. And then as far as shrinking this, I just want to make sure I understand this, in about six months, we should expect the equipment held for sale to be zero basically?
>
> **Paul Will - Celadon Group Inc – CEO** - Basically, I mean could there be some assets that on the Celadon side has been disposed, could there be a balance of $5 million, $10 million, $15 million or some nominal number on a relative basis toward leases today, yes. But for the most part, the answer is yes, so it will be our expectation is actually go zero.
>
> **Aaron Reeves - BB&T Capital Markets – Analyst** - Could you just explain a little bit how with the used equipment market as soft as it is right now and I know you said only about 20% is maybe used but how can you be so confident that you can get that off your books in that period of time without having any kind of a write down or some kind of loss?

**Paul Will - Celadon Group Inc – CEO** - ***Because we're kind of trying to address some of those questions by breaking out in the face of the balance sheet but there is already - half is already leased out. So we already know what that revenue stream is and that revenue stream is adequate, more than adequate to sell that piece off to the servicing actually that's the funding source we currently work with. And keep in mind that the equipment that is purchased in there is not the equipment that was purchased as I said earlier. A year ago, a year and a half ago, it was purchased, any of the used equipment would have been purchased in the wholesale market within the last three to six months. So it's already been in essence marked to market before you can purchase. So once again that's not an issue as far as the value there. In addition, the quality division is sales and leasing, so it also can sell retail and the retail dollars they get are significantly higher that what are not significantly a margin appropriate higher than where they are at on the books today.***

**Art Hatfield - Raymond James – Analyst** - Thank you. Hey, Paul, morning. These are some basic, I guess, I would call it, kindergarten questions, but I want to make sure I just understand a few mechanics. So when I look at the balance sheet and the assets held for sale, can you explain to me again, you've probably done this many times, but the difference between leased revenue equipment held for sale, and just revenue equipment held for sale?

**Paul Will - Celadon Group Inc – CEO** - Yes. So quality will have assets that they will either sell or lease through their retail network. If an asset is leased, it means that drivers in the truck are generating income, a leased stream of payment is in place today. Then what happens is that leased stream in essence, so that asset is sold to third-party debt financing and then Quality will then collect or remit the payments for that service provider or for that lending source. The additional assets would be sold that were put into the lease, and as I said, ***on a question earlier those assets are recent assets that were purchased and those are assets that have been around for a long period of time that have depreciated significantly in the sense as the market is down 7% to 10% on the used side that's not really necessarily impacting the assets that we're deploying.***

175. On February 9, 2016 CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended December 31, 2015, providing the Company's consolidated financial results for that period summarized in the Company's January 27 press release, including that CGI's assets included ***$49.3 million in "Leased revenue equipment held for sale" and $81.0 million in "Revenue equipment held for sale." The Company also reported $1.2 billion in total assets, $800.3 million in total liabilities, and $6.6 million in net income***. The 10-Q further provided that "***We are not obligated to make payments in respect of the leases or***

***financing provided by the Quality Financing Parties [(Element or the 19th Capital I)] to the independent contractors or fleets***," and further reported that:

> ***Gain on sale of revenue equipment increased from $4.0 million in second quarter of fiscal 2015 to $5.5 million in second quarter of fiscal 2016***. This increase was due to increased equipment sales to third parties partially offset by constrained delivery of new replacement equipment and a weaker used tractor market. We expect gain on sale to remain consistent over the next six months. However, gain on sale can vary significantly due to a variety of factors, including our ability to grow our equipment leasing and services segment, availability of replacement equipment and conditions in the new and used equipment markets.

176. The Company's February 9, 2016 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

177. The Company's February 9, 2016 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

178. On April 27, 2016, CGI issued a press release, and filed the same on Form 8-K with the SEC, entitled "Celadon Group Reports March Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended March 31, 2016. In part, CGI reported ***$56.4 million in "Leased revenue equipment held for sale" and $78.8 million in "Revenue equipment held for sale" under its "current assets." The Company further reported $1.2 billion in total assets, $797.9 million in total liabilities, and $5.2 million in net income.***

179. On April 28, 2016, CGI held a conference call to discuss its financial and operating results for the period ended March 31, 2016. During the call, Defendant Will stated:

> ***We have continued to see positive results from quality companies***, our sales and leasing division. We have been actively transitioning from a model heavily focused on gains to a more annuity-based model to better serve our customers and maintain long-term financial stability. The $2 million in gain on sale of

equipment, which is net of any trade expenses was primarily from the sale of third party equipment. The division generates $300,000 of operating income in the quarter and we expect this number to improve as we continue to transition the model. We expect operating income to be roughly $700,000 to $1 million on a quarterly basis going forward, generated from sales, leasing, business services, insurance and maintenance and gains to be in the $1 million, $2 million range for the June 2016 quarter. ***Next, I'd like to address our current leverage position. Leased assets and assets held for sale represented approximately $135 million at the end of March quarter. Of the $135 million, approximately $56 million was leased at the end of the period, which generated $6 million of lease revenue held in other revenue.*** With the reduction of the Celadon, we have seen a slight sequential increase in equipment held for sale, as we parked these assets for disposition. We had some equipment sale transactions carried over into the June quarter, where we still anticipate selling or leasing of remaining assets and equipment held for sale over the next 90 days to 120 days. We do not anticipate having any significant net cap expenditures needs for the next 12 months, so we'll continue to focus on paying down debt and reduce our leverage.

180. Defendant Will also answered questions from analysts:

**Jeff Kauffman - Buckingham Research – Analyst** - Good, thank you. I wanted to take a step back and take a little bit about the Element 19th Street strategy because I think the shortfall there is overwhelming, what's probably very strong improvement that we're seeing on the trucking side of the business. Can you talk a little bit about how the relationship with Element may be changing or how you're changing your intentions on using 19th Street which I think is more of the annuity leasing and kind of rental maintenance side of the revenue stream. How does that change in the last six to nine months, and how should we think about those relationship strategically going forward?

**Paul Will - Celadon Group, Inc. - Chairman of the Board and CEO** - So, 19th Capital and (inaudible) are both the financing sources on the equipment, that's been moved over historically. ***The equipment would be brought as we talked on last call, brought on our books, leased out and then flipped out. The relationship obviously between Element and Celadon, and 19th and Celadon are good. We continue to do transactions and continue to service the equipment on for both entities. So, what we're trying to do though on a go-forward basis, is having so that the equipment as we talked about, does not come on Celadon's books, but it's actually worked directly through third party lenders, whether it be Element 19th or any other third party. And that we believe is more conducive to what obviously is beneficial from Celadon's standpoint, from quality standpoint on a go-forward basis. So, when you take the equipment that we currently have, we're currently leasing out and really all the service offering associated with the equipment that's been leased, that's where the ongoing annuity revenue comes into play on the quality side of the business. And that's why we transformed it, and seems to have (inaudible) over the last six months, and so that we don't have the one-time gain, but yes we have this more of an***

> ***ongoing annuity which is kind of what we're laying out and we're going to be at the $700,000 to $1 million level in the June quarter, and that it should continue to grow there, from there as these sources continue to grow.***

181. On May 10, 2016 CGI filed with the SEC its quarterly report on Form 10-Q for the three-month period ended March 31, 2016, providing the Company's consolidated financial results for that period summarized in the Company's April 27, 2016 press release, including that CGI's assets included ***$56.4 million in "Leased revenue equipment held for sale" and $78.8 million in "Revenue equipment held for sale." The Company also reported $1.2 billion in total assets, $797.9 million in total liabilities, and $5.2 million in net income.***

182. CGI's May 10, 2016 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

183. CGI's May 10, 2016 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

184. On September 1, 2016, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports June Quarter and Full Fiscal Year Results and Declares Dividend" summarizing the Company's financial and operating results for the period ended June 30, 2016. In part, CGI reported ***$24.9 million in "Leased revenue equipment held for sale" and $45.0 million in "Revenue equipment held for sale" under its "current assets." The Company further reported $1.1 billion in total assets, $767.8 million in total liabilities, and $24.8 million in net income. CGI also reported a new line item on its balance sheet of "leased assets."*** CGI disclosed that:

> Our Quality Companies unit has two main businesses –equipment leasing and lease servicing. Additionally, Quality will sell used equipment operated in the Celadon trucking business and other used equipment owned by Quality and leased

to independent contractors and fleets. In addition, historically, Quality's business has included the purchase and seating of assets and the assignment of leases and sale of the related leased assets by Quality to financing sources. ***Celadon is not an obligor to the financing sources under these leases.*** The assignment of leases and sale of leased assets to financing sources has been significantly reduced since March 2016 as Quality's financing sources have tightened. Quality continues to sell leased assets and other used equipment on a smaller scale. As of June 30, 2016, Quality had servicing arrangements and other contracts in place for approximately 9,000 tractors and trailers owned by financing sources and 2,500 tractors carried on Celadon's consolidated balance sheet. ***Revenue related to Quality's business is reflected in other revenue in key operating statistics and was approximately $6.9 million for the June 2016 quarter, compared to $3.8 million for the June 2015 quarter.***

***During the June 2016 quarter, we reduced our total debt and capital lease balance by approximately $84.8 million, to $450.8 million from $535.6 million at March 31, 2016.*** The main components of this debt reduction were as follows. First, we completed a sale-leaseback transaction of approximately 4,700 trailers, which reduced our debt obligations by approximately $70 million and resulted in a deferred gain of $1.2 million. Of these trailers, we expect to refresh approximately 2,700, starting in the second half of calendar year 2017, and return approximately 2,000 over the next 12 months to match our expected fleet size and operational needs. Second, we received approximately $28 million in net proceeds from the disposition of leased equipment, with a book value of approximately $35.5 million. Under GAAP, although we transferred title of these assets, we retained certain risks of ownership through a deferred payment stream associated with the ultimate disposition of the equipment at the end of the lease period. As a result, these assets were not removed from our balance sheet, but were reclassified to leased assets, as we retain approximately 20% of the net asset value. We recorded an asset of approximately $35.5 million under leased assets and an associated liability of $28 million under other liabilities that will pay down an estimated period of 49 months as lease payments from owner operators are collected.

During the 2016 quarter, we reclassified approximately $99.3 million from current assets "leased revenue equipment held for sale" and "revenue equipment held for sale" into "leased assets." These assets are leased to independent contractors and fleets by Quality. The total is comprised of approximately $60 million of leased assets to be held as an internal leasing portfolio to generate leasing revenue. The remaining approximately $35.5 million is the transaction discussed above. The presentation is intended to differentiate the assets leased by Quality to lessees from assets used in our trucking operations. The reclassification did not affect our income, cash flows, or working capital.

185. On September 13, 2016, CGI filed with the SEC its annual report on Form 10-K for the fiscal year ended June 30, 2016, reporting, among other things, ***$1.1 billion in total***

***assets, $722.3 million in total liabilities, and $24.8 million in net income.*** The Company further reported its assets and revenue associated with revenue equipment held for sale:

> ***We have recorded leased revenue equipment held for resale on our consolidated balance sheet of $24.9 million. These assets are current under lease with and independent contractor or fleet and our equipment leasing and services segment has a plan to sell these leased assets in their current condition to a third party financing part and are currently marketing these units at a reasonable price compared to their fair value. The sale of these units is probable within one year.***
>
> ***We have recorded equipment held for resale of $44.9 million on our consolidated balance sheet.*** These units are not currently operating in the Celadon fleet, nor are they under a current lease with an independent contractor or fleet. ***Our equipment leasing and services segment plans to sell these assets in their current condition to a third party purchaser and is currently marketing these units at a reasonable price compared to their fair value. The sale is probable within one year.***
>
> ***We have recorded leased equipment on our consolidated balance sheet of $99.3 million. Our leasing and services segment leases this equipment to independent contractors and fleets. Assets in this balance that were previously classified as a current asset have changed classification due to a change in relationships with our third party leasing providers. We have reevaluated this equipment and no longer believe it is probable that those assets will be sold within the next year. Included in this balance is approximately $37 million of assets for which we received $30.0 million in proceeds from 19th Capital. Although we transferred title of these assets, we retained certain risks of ownership through a deferred payment stream associated with the ultimate disposition of the equipment at the end of the lease period. We deemed that this transaction did not qualify for sales treatment under ASC 840-20-40-3. As a result, these assets were not removed from our balance sheet. The remainder of the assets are currently under lease with an independent contractor or fleet or are open to be leased to an independent contractor or fleet.***
>
> ***We have recorded in our assets on our consolidated balance sheet an amount that represents advances made to Element relating to our Lease Shortfall Advance arrangement. These advances are for shortfalls between the required lease payments and the amount actually collected from the independent contractor or fleet. Element is required to reimburse us for Lease Shortfall Advance payments and, accordingly, we have accounted for the related receivable under other assets on our consolidated balance sheet, in the amount of $31.9 million as of June 30, 2016.***
>
> . . .

We entered into a Letter Agreement Regarding Additional Reserve Account Contributions on December 29, 2015 with Element which makes us responsible for an additional $2.5 million of reserve funds to the extent that we are unable to recoup this amount from the reseating of trucks and sale proceeds for trucks pursuant to our agreements with Element. ***We have evaluated this contingency under ASC 450 – Contingencies and determined that it is not probable that we will incur this amount at this time and therefore have not reserved this amount.***

. . .

***Gain on sale of revenue equipment decreased from $23.6 million in fiscal 2015 to $22.4 million in fiscal 2016. We expect gain on sale to decrease as we shift the focus of our equipment leasing and services segment to a more recurring revenue stream and to focus on ancillary services rather than sales of leased equipment.*** As we shift to a more recurring revenue stream we expect to reduce the potentially volatile impact of gains from sales of leased tractors and trailer. However, gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets.

186. CGI's September 13, 2016 Form 10-K also falsely assured investors of the effectiveness of CGI's internal control over financial reporting:

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2016, using criteria established in *Internal Control-Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In making this assessment management used the criteria set forth by COSO in *Internal Control— Integrated Framework (1992)*. As permitted by SEC guidance, management excluded from its assessment the operations of the A&S and Taylor acquisitions made during fiscal 2015, which are described in note 15 of the consolidated financial statements. The total assets of the entities acquired in these acquisition represents approximately 11.3% of the Company's total consolidated assets, net of goodwill, as of June 30, 2016. Based on this assessment, our management has concluded that as of June 30, 2016, our internal control over financial reporting is effective based on those criteria.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become

> inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.
>
> The effectiveness of our internal control over financial reporting as of June 30, 2016 has been audited by BKD LLP, an independent registered public accounting firm, as stated in their attestation report. See "Financial Statements and Supplementary Data" under Item 8 of this Annual Report on Form 10-K for BKD LLP's attestation report.
>
> **CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> The Company's management, including the Company's Chief Executive Officer and its Chief Financial Officer regularly review our disclosure controls and procedures and make changes intended to ensure the quality of our financial reporting. There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

187. CGI's September 13, 2016 Form 10-K was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

188. On November 2, 2016, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports September Quarter Results and Declares Dividend" summarizing the Company's financial and operating results for the period ended September 30, 2016. In part, CGI reported ***$18.0 million in "Leased revenue equipment held for sale" and $29.0 million, in "Revenue equipment held for sale" under its "current assets." CGI also reported "leased assets" of $111.5 million***. CGI also disclosed an MOU with Element under which it intended to move off its books all three categories of equipment listed above:

> On September 13, 2016, we signed a Memorandum of Understanding (the "MOU") with Quality's main third party financing provider, under which substantially all of Quality's tractors under management owned by such third party financing provider, 19th Capital, and Quality would be combined into 19th Capital as a joint venture. Upon closing of the joint venture, the existing

agreements with the third party financing provider would be terminated and replaced with definitive agreements contemplated by the MOU.

Under the MOU, the next steps involving our fleet would include (1) ***the purchase of approximately $50.0 million of equipment by the joint venture***, with financing to the joint venture being provided by the third party financing source, and (2) ***our contribution will include approximately $70 million of additional equipment to the joint venture. These two additional transactions would eliminate substantially all equipment held for resale and leased assets from our consolidated balance sheet and result in net cash to us of approximately $50.0 million.***

189. On November 3, 2016, CGI held a conference call to discuss its financial and operating results for the period ended September 30, 2016. During the call, Defendant Will stated:

**Paul Will - Celadon Group, Inc. - Chairman & CEO** - As indicated in the press release on September 30, 2016, we signed a memorandum of understanding with Quality's main third-party financing provider, under which substantially all of Quality's tractors under management owned by such third-party financing provider, 19th Capital and Quality would be combined into 19th Capital as a joint venture. Upon closing of the joint venture of the existing agreements within the third-party financing provider would be terminated and replaced with the definitive agreements contemplated by the MOU. ***This transaction would eliminate substantially all equipment held for resale and leased assets from our consolidated balance sheet, resulting in net cash to us of approximately $50 million and in fact will eliminate substantial capital needs related to the Quality business going forward.*** Our goal is to complete the joint venture in the December 2016 quarter. Although we believe the transaction is on schedule for this timeframe, it remains subject to various consents, definitive documentation and other risks associated with change in terms or failure to reach agreement

190. Defendant Will also answered questions from analysts:

**John Engstrom - Stifel – Analyst -** Thank you very much for your call and your time on us for taking the questions. The question I had pertain to the residual values and salvage values assumed on assets as it pertains to your depreciation schedule, do you guys have a view into sort of what the aggregate assumed residual value is?

Paul Will - Celadon Group, Inc. - Chairman & CEO - On our existing equipment? ***What we've got, we believe the way we've evaluated or valued our equipment and the timeframe in which it's going to be depreciated over is currently appropriate relative to what we think the value is going to be, when we dispose of it.*** Relative to where we're at from a fleet standpoint, we don't have any

significant CapEx requirements other than maybe some [navigation] tractors for the next probably 12 months, which gives us obviously time to continue to evaluate that as time goes on. We did our trailer transaction last quarter, a quarter ago, which basically took residual risk away from 4,700 trailers there. As well as, we have some equipment coming out that is on fair market value leases that once again there's no risk on that as well. ***So we believe at this point in time, the equipment that we have and that we're running, we don't have any residual risk today and we don't have, obviously, an equipment necessary that we share the risk on, coming out of the next 12 months.***

**John Engstrom - Stifel – Analyst** - Okay, thank you very much for that. That's helpful. And now is there a commentary or at least the relative depreciation consistent between both Celadon and Quality and I'll caveat, our understanding that you guys have just signed a MOU on Quality, which may change the circumstance abit. But for the assets that are leased and the assets that are held for sale on Quality versus the Celadon assets that are in revenue service, are they all being depreciated the same or are they categorically different?

Paul Will - Celadon Group, Inc. - Chairman & CEO ***Yes, they're different in - the leasing equipment that we've got is depreciated in a manner, which it will generate the right revenue stream and expense stream so that when that equipment is disposed of, the goal is to not have any negative impact from a P&L standpoint. So as we look towards this transaction based on that equipment and how we would depreciate that equipment, we don't believe that there will be any negative impact - anything going into the joint venture.***

John Engstrom - Stifel – Analyst - Okay, understood. Thank you very much for that. And the last question I had pertain to post MOU looking forward into calendar year 2017. Will you guys still be responsible for any of the risk associated with the leases?

Paul Will - Celadon Group, Inc. - Chairman & CEO - No, the goal of this whole transaction is to, as we said in the last press release is to continue to evolve Quality into being more of an asset-light service provider, without any capital requirements on a go forward basis, no buying equipment buying equipment for a sale or lease, it will continue to be used in the long run to dispose of Celadon company equipment, but not to [spec legal] or buy equipment or lease equipment. ***The purpose of the joint venture, is to bundle all of the equipment together in one unified form, we're pretty excited putting all the equipment together, we believe the joint venture will be very successful relative to the team focus on all that equipment under one roof being jointly managed by the two parties as opposed to now it's, kind of, split three different buckets***. So what we see long-term is that there is no capital requirements, all the equipment now for resale and all the equipment that comes out of Quality's and Celadon's balance sheet, that's going to be all be managed by the in essence Quality equipment that's a benefit of the joint venture and will continue to generate our portion of the income of that joint venture over time as well. But then it gets us back to really a core, our focus

on the trucking business and in the four principles, what we're trying to accomplish is first lane density and consists committed dedicated business, working on our asset light, etcetera. And then we look at Quality is kind of belong to the asset light side, which will require CapEx and therefore, it should be a non-asset revenue stream in the future.

**Unidentified Participant** - Okay, thanks. And then on the MOU, why would Element do something that was in your favor? Anything that goes in your favor is going to be not in their favor. Can you help me understand why they would do an MOU to change the terms?

**Paul Will - Celadon Group, Inc. - Chairman & CEO** - ***I think the MOU itself, it ends up creating a beneficial ratio of 50:50 joint venture that does not do anything to harm their current position. I think, what it does is it further enhances the ability for the two parties to work together, combining all the assets to be more efficient in how we're running the business itself, that's what the goal is.*** And then there's, obviously, synergistic opportunities we believe with some of the other business units that we can obtain over time as well. So I don't think it has anything do with losing leverage or a position. ***I think, it's what was believed to be a positive long-term joint venture that should be good for both parties.***

**Unidentified Participant** - Okay, I'm sorry, I don't get it. Can you give me an example of something that's going to help, that's going to benefit them, an incentive for them to the change their [rate with you]?

**Paul Will - Celadon Group, Inc. - Chairman & CEO** - I can't, we're still in the process of going through it. I can't really speak to what's not public information at this point in time.

Unidentified Participant - Okay. (inaudible) MOU going into an agreement that you [both like].

Paul Will - Celadon Group, Inc. - Chairman & CEO - ***I think what we stated is our expectation is it should move forward, but, obviously, nothing is a given until it's complete.***

191. On November 9, 2016, CGI filed with the SEC its quarterly report on Form 10-Q for the three month period ended September 30, 2016, providing the Company's consolidated financial results for that period, including that CGI's assets included ***$18.0 million in "Leased revenue equipment held for sale" and $29.0 in "Revenue equipment held for sale." CGI also reported "leased assets" of $111.5 million.*** The Form 10-K explained further that:

***Gain on sale of revenue equipment decreased from $13.2 million in first quarter of fiscal 2016 to $1.3 million in first quarter of fiscal 2017. The decrease resulted from a cessation in sales of leases and underlying equipment by our equipment leasing and services segment, fewer dispositions from our fleet, and lower prices for dispositions due to a weak used equipment market. We expect gain on sale to remain generally consistent with the levels experienced in the first quarter of fiscal 2017 as we have shifted the focus of our equipment leasing and services segment to a more recurring revenue stream and to focus on ancillary services rather than leasing and sales of leases and underlying equipment. The shift to a more recurring revenue stream, is expected to reduce the potential volatile impact of gains on sale of leased tractors and trailers. However, gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets.*** While we have no plans for our equipment leasing and services segment to acquire additional assets to lease or sell any significant additional leases and the underlying equipment at this time, we will continue to evaluate opportunities as the market permits.

. . .

***In the first quarter of fiscal 2017, in a separate transaction we received $15.0 million in net proceeds from the disposition of leased equipment, with a book value of approximately $22.8 million. Upon completion of the underlying leases we are entitled to receive the remaining portion of the sales proceeds which is $7.8 million.*** Although we transferred title of these assets, we retained certain risks of ownership through a deferred payment stream associated with the ultimate disposition of the equipment at the end of the lease period. We deemed that this transaction did not qualify for sales treatment under ASC 840-20-40-3. As a result, these assets were not removed from our balance sheet, but were reclassified to leased assets, as we retain approximately 34% of the net asset value. ***We originally recorded a liability of $15.0 million with the current portion in other deferred leasing revenue and other related lease liabilities and the long-term portion under other liabilities that will pay down over an estimated period of 39 months as lease payments from owner operators are collected and remitted to 19th Capital. As of September 30, 2016, we had $30.7 million of other long-term liabilities and $11.9 classified as current under deferred leasing revenue and other related lease liabilities. The other long-term liability and current portion are inclusive of a similar transaction from fiscal 2016.***

. . .

***We have recorded leased revenue equipment held for sale on our consolidated balance sheet of $18.0 million. As of September 30, 2016, these assets were under lease with an independent contractor or fleet and our equipment leasing and services segment has a plan to sell these leased assets in their current condition to a third party purchaser and are currently marketing these***

*units at a reasonable price compared to their fair value. We believe the sale of these units is probable within one year.*

*We have recorded equipment held for sale of $29.0 million on our consolidated balance sheet. These units are not currently operating in the Celadon fleet, nor are they under a current lease with an independent contractor or fleet. Our equipment leasing and services segment plans to sell these assets in their current condition to a third party purchaser and is currently marketing these units at a reasonable price compared to their fair value. We believe the sale of these units is probable within one year.*

*We have recorded leased equipment on our consolidated balance sheet of $111.5 million. Our leasing and services segment leases this equipment to independent contractors and fleets. Assets in this balance that were previously classified as a current asset have changed classification due to a change in relationships with our third party leasing providers. Consistent with the June 30, 2016 quarter, we have reevaluated this equipment and no longer believe it is probable that these assets will be sold within the next year. Included in this balance is approximately $59 million of assets for which we received $45.0 million in proceeds from 19th Capital. Although we transferred title of these assets, we retained certain risks of ownership through a deferred payment stream associated with the ultimate disposition of the equipment at the end of the lease period. Upon completion of the underlying leases we are entitled to receive the remaining portion of the sales proceeds which is $15.4 million. We deemed that this transaction did not qualify for sales treatment under ASC 840-20-40-3. As a result, these assets were not removed from our balance sheet. The remainder of the assets are currently under lease with an independent contractor or fleet or are open to be leased to an independent contractor or fleet.*

*We have recorded in assets on our consolidated balance sheet an amount that represents advances made to our third party financing provider relating to our lease shortfall advance arrangement. These advances are for shortfalls between the required lease payments and the amount actually collected from the independent contractor or fleet. The financing provider is required to reimburse us for these advances and, accordingly, we have accounted for the related receivable under other assets on our consolidated balance sheet, in the amount of $31.9 million as of September 30, 2016 and June 30, 2016.*

*We entered into a Letter Agreement Regarding Additional Reserve Account Contributions on December 29, 2015 with our third party financing provider which makes us responsible for an additional $2.5 million of reserve funds to the extent that we are unable to recoup this amount from the reseating of trucks and sale proceeds for trucks pursuant to our agreements with the financing provider. We have evaluated this contingency under ASC 450 – Contingencies and believe that it is not probable that we will incur this amount at this time and, therefore, have not reserved this amount.*

192. CGI's November 9, 2016 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

193. CGI's November 9, 2016 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

194. On December 30, 2016, CGI issued a press release entitled "Celadon Group Announces Closing of Joint Venture with Element Fleet Management," in which CGI, among other things, touted its $100 million investment in its newly-created joint venture with Element. The press release stated, in pertinent part:

> INDIANAPOLIS, Dec. 30, 2016 /PRNewswire/ -- Celadon Group, Inc. (NYSE: CGI) ("Celadon") announced today that it has entered into a joint venture agreement with Element Transportation LLC ("Element"), a subsidiary of Element Fleet Management (TSX: EFN). The joint venture will hold leasing assets managed by Celadon's Quality Companies, LLC business unit ("Quality") and formerly held by a combination of Celadon (including, Element, and 19th Capital Group, LLC ("19th Capital"), a Delaware limited liability company.
>
> **Company Statement**
>
> Chairman and Chief Executive Officer Paul Will commented: "We are very pleased to announce the closing of our previously announced joint venture transaction with Element. Since August, we have been working diligently with the Element team to structure a ***high quality, well-capitalized business*** that will provide excellent transportation assets and high quality service to our customers. With the interests and investments of Element and Celadon strongly aligned, an experienced management team, and the resources to optimize leasing assets, the joint venture has the components for success. The support and business acumen of the Element team were instrumental to the process, and we appreciate their partnership.
>
> "In addition to capitalizing ***a strong joint venture***, the transactions furthered Celadon's goals of exiting the capital intensive component of the leasing business, reducing balance sheet debt, and converting our Quality Companies unit primarily to an asset light business. We believe the transaction has multiple benefits for our stockholders and are excited to be able to focus our resources on the trucking side of the business."

**About the Joint Venture**

The joint venture represents the combination of the former equipment leasing portfolios of Celadon, Element, and 19th Capital that were managed by Quality. The joint venture holds over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets. The joint venture is considered to be one of the leading lessors to this market, with an augmented and experienced management team that is focused on driving excellence throughout the business.

The joint venture was formed through recapitalizing 19th Capital. The former owners of 19th Capital (including Celadon's former Class A and Class B interests) were redeemed using pre-transaction cash of 19th Capital, and new equity was contributed by Celadon and Element to establish the post-transaction capitalization. ***Celadon's contribution includes cash and lease equipment totaling $100 million in value*** in exchange for its equity in the joint venture. The cash component was more than offset by proceeds of redemption, settlement of the deferred purchase price on assets sold to 19th Capital in FY2016, and collection of an amount relating to the terminated pre-joint venture arrangements. After the contributions, each of Celadon and Element own approximately 49.99% of the joint venture's equity, with employees of 19th Capital holding the remainder.

As part of the transaction, all previous agreements between Celadon, Element, 19th Capital, and their respective affiliates, have been terminated or assumed by the joint venture with no liability of Celadon. Quality has entered into a new Service Agreement with the joint venture and will provide leasing management services in exchange for a monthly fee per tractor.

**Additional Information**

In addition to closing the joint venture, ***Celadon received approximately $50 million in cash proceeds from the sale of equipment associated with the Quality business at net book value for use by the joint venture.*** This sale and the equity contribution of equipment substantially reduced the Company's equipment held for sale, leased assets held for sale, and leased assets.

195. On January 6, 2017, the Company filed a Form 8-K with the SEC further detailing the Joint Venture and its contributions thereto, including that the company had contributed a $31.8 million cash reimbursement of Lease Shortfall Advances received from Element, and had received $56.0 million from equipment sales, among other things:

***The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held***

***for sale, leasing assets held for sale, or leasing assets used with a net book value of $63.6 million, and (iii) received credit for $1.1 million of unencumbered cash in the bank accounts of 19th Capital immediately at the consummation of the Transaction. In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital, (ii) paid to the Company $31.8 million in cash for reimbursement of previous payments made by the Company related to the Element assets, and (iii) issued the Company an obligation to distribute restricted cash of 19th Capital and its subsidiaries at the closing of the Transactions of approximately $2.5 million at such time as such cash becomes unrestricted. Going forward, the Company has agreed not to enter into additional leases as lessor in the equipment leasing business, subject to a modest exception for short-term leasing pending ordinary course dispositions from the Company's trucking fleet.***

****

**Summary of Cash Sources and Uses**

The following table summarizes the Company's primary sources and uses of cash associated with the Transactions (excluding taxes, fees, and expenses):

| Source / (Use) (in millions) | Description |
|---|---|
| $ 4,600 | Cash received – redemption |
| 6,700 | Cash received – receipt of deferred purchase price cash |
| 50,000 | Cash received – sale of Quality equipment |
| 31,800 | Cash received – reimbursement of Other Assets |
| (35,300) | Cash invested in 19th Capital at closing |
| $ 57,800 | Net cash received at closing |

****

**Summary of Equipment Transactions**

The following table summarizes the Company's total contribution to 19th Capital at closing, including equipment dispositions associated with the Transactions:

| Source / (Use) (in millions) | Description |
|---|---|
| $ 56,000 | Equipment contributed to 19th Capital at closing |
| 21,900 | Contribution of deferred sale assets from 9/30/2016 |
| 50,000 | Equipment sold to Element at closing |
| 34,600 | Settlement of deferred sale assets from 6/30/2016 |
| $ 162,500 | Total equipment reduction at closing |
| | |
| $ 14,300 | Contribution of deferred sale liability from 9/30/2016 |
| 26,000 | Settlement of deferred sale liability from 6/30/2016 |
| $ 40,300 | Total reduction in liabilities at closing |
| | |
| $ 77,900 | Equipment contributed to 19th Capital at closing |
| (14,300) | Other liabilities related to contributed deferred sales assets |
| 35,300 | Cash contributed to 19th Capital |
| 1,100 | Undistributed cash remaining with 19th Capital |
| $ 100,000 | Total contribution to 19th Capital at closing |

196. On February 1, 2017, CGI issued a press release, and filed the same on Form 8-K with the SEC the following day, entitled "Celadon Group Reports December Quarter Results and Declares Dividend" summarizing the Company's financial and operating results for the period ended December 31, 2016. In part, CGI reported ***$0 in "Leased revenue equipment held for sale," $0 in "Revenue equipment held for sale," and "leased assets" of $0***, all as a result of the formation of the 19th Capital II. CGI also disclosed:

> As previously announced, on December 30, 2016, Celadon and Element Financial entered into a joint venture, 19th Capital Group, which combined the leasing portfolios of leasing assets managed by Quality Companies, into one entity. As a result of the transaction, ***Celadon was able to sell or contribute the assets previously held on the balance sheet in revenue equipment held for sale, leased assets held for sale, and leased assets. Celadon's investment into 19th Capital was $100 million, which included $35.3 million in cash, $63.6 million in net equipment assets, and a credit of $1.1 million for undistributed cash in the previous minority owned 19th Capital. Celadon also received net cash of $57.8 million at closing, which was used to pay down debt. Shortly before closing of the joint venture, the previous ownership structure of 19th Capital was redeemed, and Celadon recognized income of $1.8 million related to the minority ownership in that entity.***

> Going forward, Quality Companies will service the leasing portfolio of 19th Capital in exchange for a monthly servicing fee per tractor. We will record 49.999975% of the joint venture's income or loss under "income (loss) from minority investment" on the income statement. We do not expect to have any material equipment sales and purchases related to the leasing business going forward. However, Quality will continue to dispose of equipment previously used within the trucking operation. The trucking operation will continue to acquire assets separately for its operational needs.

197. On February 2, 2017, CGI held a conference call to discuss its financial and operating results for the period ended December 31, 2016. During the call, Defendant Will answered questions from analysts concerning CGI's depreciation policy:

> **John Larkin - Stifel Nicolaus – Analyst** - Interesting. Thank you. And then maybe one other question did dawn on me here as you were answering, supposedly last one, and that relates to, as you look at your depreciation schedules and you look at your residual values embedded in your accounting policies, have you looked at that recently to see whether any changes are needed in order to reflect the fact that the used truck values have really been hammered so hard here over the last 12 months or so?
>
> **Paul Will - Celadon Group, Inc. - Chairman of the Board, CEO** - Yes. I mean, we monitor that every month. So we always go through and review where we're at. ***We feel very confident with where residuals are placed currently. So, we think we're positioned well.*** We think the used equipment market will rebound this year and will continue to rebound into 2018 (inaudible). So, I think by the time our trade cycle starts coming out, the used market will probably be back to more normalized. ***And even if it is, we feel that we're properly depreciating to the point that we'll be in a good position to exit those assets when that time does come.***

198. On February 10, 2017, CGI filed with the SEC its Quarterly Report on Form 10-Q for the three-month period ended December 31, 2016, providing the Company's consolidated financial results for the three month period ending December 31, 2016, including that CGI's assets included $0 in "Leased revenue equipment held for sale," $0 in "Revenue equipment held for sale," and $0 of "leased assets." CGI further explained that:

> ***Gain on sale of revenue equipment decreased from $5.5 million in second quarter of fiscal 2016 to $0.5 million in second quarter of fiscal 2017. This decrease was due to decreased equipment sales to third parties and a weaker used tractor market. We expect gain (loss) on sale with respect to revenue***

> ***equipment to be relatively small for the balance of fiscal 2017. Gain (loss) on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets.*** Other than in connection with equipment turnover in our trucking operations fleet, we have no plans for our equipment leasing and services segment to acquire additional assets to lease or sell any significant additional leases and the underlying equipment at this time.

199. CGI's February 10, 2017 Form 10-Q also touted the Company's collection of $31.8 million in Lease Shortfall Advances from Element and, in-turn, contribution of that money to the 19th Capital II:

> **Non-Controlling Investment**
>
> In December 2016, the Company, Quality Companies LLC, a wholly-owned subsidiary of the Company ("Quality"), Quality Equipment Leasing, LLC, a wholly-owned subsidiary of the Company ("Leasing"), 19th Capital Group, LLC, a non-controlling investment of the Company before and after the transactions described below ("19th Capital"), Element Transportation LLC ("Element"), and certain other parties entered into a series of simultaneous agreements and related transactions (collectively, the "Transactions"), pursuant to which substantially all tractors under management by Quality and owned by Element, 19th Capital, Quality, and Leasing have been combined into 19th Capital as a joint venture primarily between the Company and Element. After the Transactions, the Company and Element each own a non-controlling approximately 49.99% interest in 19th Capital, which at December 31, 2016, held the rights to over 10,000 tractors for use in leasing operations. The Company recorded $100.0 million as a minority investment and will record operating results of the joint venture using the equity method of accounting. The Transactions included the following:
>
> - *Redemption of Existing Members*: 19th Capital redeemed all of its issued and outstanding membership interests, including those owned by the Company, for $15.7 million in cash. The Company's proceeds from the redemption were approximately $4.6 million in cash. The proceeds received relate primarily to the original $2.0 million that had been invested by the Company in 2015 and its proportionate share of undistributed earnings from inception. The Company recorded a net gain on the redemption of approximately $0.3 million, reflecting the excess of redemption proceeds over the initial investment plus equity income profits previously recognized. In addition to the redemption amount, the Company is entitled to receive approximately $2.5 million in restricted cash when the restrictions lapse. The Company has evaluated this receivable under ASC 450 – Contingencies and has not recorded a receivable within our financial statements at this time. If and when collected, this amount would be recorded as income.

- *Deferred Sale with 19th Capital*: As part of the Transactions the Company received proceeds of $6.7 million in payment of deferred purchase price from a sale of equipment to 19th Capital in the June 30, 2016 quarter. This collection triggered sales accounting treatment for leased assets where recognition of the sale was deferred and leased assets remained on the Company's balance sheet. As a result, the Company removed $34.6 million of "Leased assets" and $26.0 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". The Company did not recognize any gain or loss with this transaction.

- *Sale to Element*: ***The Company sold tractors and trailers and assigned the related leases to Element for approximately $50.0 million. There was no material gain or loss on the disposition of this equipment.***

- ***Receipt of Lease Servicing Advance ("Perfect Pay")*****: The Company received $31.8 million in cash related to a receivable from Element related to the Company's Perfect Pay obligations under the prior service agreements with Element.**

- *Contribution by the Company*: ***The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used, with a net book value of $56.0 million, (iii) received credit for $1.1 million of amounts owed to the Company by 19th Capital and (iv) contributed $7.6 million of the remaining consideration due from 19th Capital related to a September 30, 2016 deferred sale transaction with 19th Capital that was previously recorded as a financing transaction under GAAP. The contribution of the $7.6 million resulted in the removal of "Leased assets" of $21.9 million and $14.3 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities".*** In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital.

- *Summary of Transactions*: The following table summarizes the Company's total contribution to 19th Capital at closing (in thousands):

| | Contribution | Description |
|---|---|---|
| $ | 56,000 | Equipment contributed to 19th Capital at closing |
| | 7,600 | Contribution of deferred sale receivable |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Receivable due from 19th Capital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

****

> **Cash Flows**
>
> ***Net cash provided by operations for the six months ended December 31, 2016 was $58.5 million, compared to $22.9 million for the six months ended December 31, 2015. The increase reflected several items related to the closing of our joint venture in December 2016 and related equipment transactions during the period. These items include, $31.8 million in collection of cash payment recorded under other assets***, distributions received on earnings from an unconsolidated entity of $2.6 million, and a $16.9 million reduction in leased revenue equipment held for sale. Excluding these amounts, net cash flow provided by operations was $7.2 million for the six months ended December 31, 2016. ***Leased revenue equipment held for sale reflects $82.1 million of sales less $65.2 million of purchases for the six months ended December 31, 2016***. These purchases relate solely to equipment for the benefit of our equipment leasing and services segment which activities will be undertaken through 19th Capital moving forward. Leased revenue equipment held for sale was zero at December 31, 2016. Purchases and sales of used Celadon fleet equipment are included within our net cash provided by investing activities.

CGI also disclosed that it ***"recorded the value of our investment in 19th Capital at $100.0 million, based on our net book value of the assets contributed."***

200. CGI's February 10, 2017 Form 10-Q also falsely assured investors of the effectiveness of the Company's internal control over financial reporting in a manner substantially similar to the disclosure described in ¶129, *supra*.

201. CGI's February 10, 2017 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶130, *supra*.

202. As disclosed in its April 2, 2018 Press Release, all of the above statements regarding CGI's financials were false when made.

### A. The False Statements Had a Material Impact on Celadon's Financial Statements

203. Celadon has yet to accurately restate its financial results for 2014, 2015, and 2016. However, it has provided information about the massive extent of problems in its reports.

204. In its April 2, 2018 press release, Celadon disclosed that it expects adjustments related to its transactions with Element to result in an increase in reported total assets of approximately $500 million for the three-year period ended June 30, 2016, as well as an increase in reported total liabilities of approximately $700 million for the same period.[8]

205. In its April 2, 2018 press release, Celadon also disclosed that it expects the adjustments related to its transactions with Element to result in a reduction to net income before income taxes by a range of $200-$250 million cumulatively over the three-year period ended June 30, 2016. Net income before income taxes is a critical metric for analysts and investors alike as it indicates a company's ability to generate earnings from operations.

206. The expected change to total assets is demonstrated in the following table:

| **Fiscal Period Total Assets *(numbers in thousands)*** | **As Originally Reported** | **Restatement Adjustments (projected)** | **As Restated (projected)** | **% Increase of Total Assets (projected)** |
|---|---|---|---|---|
| Fiscal 2014 | $690,815 | N/A | N/A | N/A |
| Fiscal 2015 | $1,175,689 | N/A | N/A | N/A |
| Fiscal 2016 | $1,103,290 | N/A | N/A | N/A |
| Cumulative Fiscal 2014 through Fiscal 2016 | $2,969,794 | $500,000 | $3,469,794 | 16.9% |

[8] The Company also reported in its April 2, 2018 press release, that "[a]djustments to assets and liabilities for the first two quarters of fiscal 2017 are still under review."

207. The expected change to total liabilities is demonstrated in the following table:

| **Fiscal Period Total Liabilities *(numbers in thousands)*** | **As Originally Reported** | **Restatement Adjustments (projected)** | **As Restated (projected)** | **% Increase of Total Liabilities (projected)** |
|---|---|---|---|---|
| Fiscal 2014 | $413,812 | N/A | N/A | N/A |
| Fiscal 2015 | $809,346 | N/A | N/A | N/A |
| Fiscal 2016 | $722,275 | N/A | N/A | N/A |
| Cumulative Fiscal 2014 through Fiscal 2016[9] | $1,945,433 | $700,000 | $2,645,433 | 36% |

208. The expected change to net income before income taxes is demonstrated in the following table:

| **Fiscal Period Net Income Before Income Taxes *(numbers in millions)*** | **As Originally Reported** | **Restatement Adjustments (projected low/high)** | **As Restated (projected low/high)** | **% Decrease of Net Income Before Income Taxes (projected low/high)** |
|---|---|---|---|---|
| Fiscal 2014 | $50.4 | N/A | N/A | N/A |
| Fiscal 2015 | $57.9 | N/A | N/A | N/A |
| Fiscal 2016 | $38.4 | N/A | N/A | N/A |
| Cumulative Fiscal 2014 through Fiscal 2016 | $146.7 | ($200/$250) | ($53.3/$103.3) | (136.3%/170.4%) |

[9] Celadon's financial statements do not contain a separate line item on its balance sheets for "total liabilities" and instead reports "total liabilities and stockholders' equity." Celadon reported total stockholder equity (numbers in thousands) of $259,003; $366,343; and $381,015 in 2014, 2015, and 2016 respectively. The "total stockholders' equity" was subtracted from the "total liabilities and stockholders' equity" to arrive at the figures for "total liabilities."

209. Thus, the misstatements enabled the Company to report net income before taxes of $146.7 million for the three-year period covering fiscal 2014 through fiscal 2016, when, in fact, Celadon actually suffered losses of between $53.3 and $103.3 million.

210. As the Company made clear in its April 2, 2018 press release, the expected restatement will have a material impact on the Company's financials:

> The anticipated adjustments . . . are subject to ongoing review and analysis and cannot be precisely quantified with respect to any period at this time. However, the cumulative effect of the adjustments, along with operating losses and other expenses since the Company's last filed financial reports, **are expected to reduce its reported stockholders' equity materially. The adjustments are also expected to have a material impact on assets, liabilities, revenue, income (loss), and individual expense items in certain periods.**

211. Thus, although Celadon has yet to complete its massive restatement, the materiality of its false statements on nearly every key metric is readily admitted by the Company itself.

212. The sheer magnitude of the restatement also supports a strong inference of scienter. The restatement covers more than three years and permitted the Company to appear profitable, when in fact, it was hemorrhaging money at alarmingly high rates.

**B. Defendants Knew or Recklessly Disregarded Celadon's Deficient Internal Controls**

213. As admitted in the Company's April 2, 2018 press release, Celadon lacked effective internal control over its financial reporting during fiscal 2014, 2015, and 2016:

> Due to the restatement issues identified above, on April 2, 2018, the Audit Committee and the Company's management concluded that **the annual financial statements for the Company's 2014 and 2015 fiscal years, the unaudited quarterly reports issued during such periods, and the unaudited quarterly reports issued during fiscal 2016, should no longer be relied upon.** In addition, the Company has concluded that **there were deficiencies in its internal control over financial reporting that constituted material weaknesses for each of the affected periods and, as a result, management's reports on its internal control over financial reporting as of June 30, 2014, June 30, 2015, and June 30, 2016, should no longer be relied upon.** The Company has engaged outside

> advisors to assist in remediating deficiencies in its internal control over financial reporting.

214. Celadon had previously disclosed in its May 1, 2017 Form 8-K, that its financial reports for the quarters ended September 30 and December 31, 2016 (the last periods for which Celadon issued quarterly reports) could no longer be relied upon.

215. As discussed above, Defendants Peavler and Will each signed the quarterly and yearly financial reports, all of which assured investors of the effectiveness of CGI's internal control over financial reporting.

216. Additionally, Defendant Will signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") for Celadon's quarterly and yearly financial reports from the first quarter of fiscal 2014 through the second quarter of fiscal 2017. Defendant Peavler also signed SOX certifications for Celadon's quarterly and yearly financial reports from the fourth quarter of fiscal 2015 through the second quarter of fiscal 2017.

217. The nature of Celadon's relationship with its independent auditor, BKD LLP, strongly suggests that Defendants Peavler and Will either knew about, or recklessly disregarded CGI's significant accounting problems.

218. On April 5, 2017, *Seeking Alpha* published a report titled, "Celadon Group: A Story That Ends At Chapter 11," which raised significant questions about CGI's relationship with BKD:

> **KMPG Requires CGI to Restate Its Financials, Is Later Dismissed**
>
> In 2012, KMPG forced CGI to restate its PP&E and capitalized lease obligations. Per CGI's 8-K filed on 4/25/2012,
>
> . . .
>
> The nature of the restatement is concerning because, as we have outlined in this report, we think CGI has been systematically overstating its PP&E balance.

A little over a year later, in October 2013, CGI dismissed KPMG, a Big4 auditor, and engaged BKD LLP, a regional auditor.

**BKD Audit Fees Explode After Replacing KPMG**

Growing companies often switch from smaller/regional auditors to Big4 auditors as they grow. Occasionally, companies will switch from one Big4 auditor to another Big4 auditor to reduce fees. We can't think of a single reputable public company that has switched from a Big4 auditor to a regional auditor. And for good reason: Smaller firms are more resource-limited. We question why CGI would decide to switch from a Big4 auditor to a smaller/regional firm. Further, we wonder if BKD has the necessary manpower to effectively audit a sprawling, asset-intensive business like CGI.

One of the most notable red flags in the CGI-BKD relationship is that CGI's audit fees have skyrocketed from the levels prevailing during KPMG's tenure. From FY'14 to FY'16, the annual fees CGI paid to BKD increased an astonishing 179.6% from $284K to $693K. **Given the strong relationship between high audit fees and significant accounting issues, we believe CGI's auditor has implicitly highlighted the financial risk through its audit fee.**

. . .

**Outsized Audit Fees Signal Outsized Audit and Operational Risk**

According to Audit Analytics, a professional research organization, auditor fees are determined by audit risk and "*audit fees can be used [as] a risk indicator.*" For example, Enron had the third highest audit fee of any US public company because its auditors believed it was their "riskiest client." Enron's audit fee exceeded companies that were significantly larger and more complicated.

. . .

Furthermore, multiple academic studies have shown that elevated audit fees are associated with higher operating risk.

219. Tellingly, BKD was quick to withdraw its reports on Celadon's June 30, 2016, September 30, 2016, and December 31, 2016 financial statements. Indeed, Celadon disclosed in its May 1, 2017 press release, that BKD had withdrawn its support on April 25, 2017, just weeks after the publication of the *Seeking Alpha* article. The May 1, 2017 press release revealed that BKD informed the Company that ***BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports*****[.]**"

220. A May 13, 2017 article published in the *Indiana Business Journal*, entitled "Behind the News: Inside the issues that grounded Celadon," revealed that the Company was paying BKD more than double what it had been paying KPMG.

221. As noted in the *Seeking Alpha* article published on October 12, 2016, entitled "Celadon Group: SEC Inquiries, Accounting Issues And Liquidity Constraints Point To 65% Near-Term Downside," "**Since switching its auditor from KPMG to BKD in late 2013, CGI's accounting and disclosures have become increasingly opaque and irregular.**"

222. Of particular note, the Company's October 2, 2013 Form 8-K disclosed that the earlier restatement, forced by KPMG, concerned material weaknesses in the Company's internal control over financial reporting "related to controls to evaluate leases for capital lease or operating lease classification . . ."

223. Likewise, improper lease classification is one of the subjects of the current restatement.

224. In its 10-Q for the second quarter of 2017, Celadon falsely claimed to have collected $31.8 million of prior Lease Shortfall Advances from Element. This was nothing more than a sham "daylight loan" from the Joint Venture. Celadon never actually collected its Lease Shortfall Advances. Rather, Element provided a "daylight loan" of $31.8 million to the Joint Venture. The Joint Venture then gave the $31.8 million to Celadon, who in turn paid the $31.8 million back to the Joint Venture to pay off the outstanding contribution from Element. The following table from the April 5, 2017 *Seeking Alpha* article illustrates the sham transaction:



225. As admitted in its May 3, 2017 live business update, Celadon improperly accounted for the $31.8 million.

226. Perhaps more troubling, the April 5, 2017 *Seeking Alpha* report suggested that Celadon overstated the value of its stake in the Joint Venture by $100 million, not just the $31.8 million from the sham "daylight loan," and that Celadon's stake in the Joint Venture was actually worthless.

227. Celadon confirmed in its April 2, 2018 Press Release that the restatement may result in the "reduction of the Company's equity method investment [in the Joint Venture] to as low as zero."

228. It is inconceivable that management could not have known about the accounting gimmicks, particularly where outside analysts were able to read between the lines to reveal the exact falsehoods later admitted to by the Company.

229. The April 5, 2017 *Seeking Alpha* article also revealed that, George Chasteen, the former President of 19th Capital, is actually the nephew of Defendant Will. This further explains how the Company was able to use 19th Capital to falsely prop up its financials.

230. Additionally, on October 2, 2014, CGI filed a disclosure with the SEC on Form 8-K, announcing the Company's senior management-based cash program for Fiscal 2015. The program set Defendant Will's cash bonus target at $325,000. Will would receive anywhere from 0% to 200% of his target depending on the Company's earnings per share:

Diluted EPS Calculation

| Fiscal 2015 EPS | Percentage of Target Bonus |
|---|---|
| <$1.10 | 0% |
| $1.10 | 50% |
| $1.20 | 100% |
| $1.30 | 150% |

| | |
|---|---|
| $1.40 | 200% |

231. CGI reported diluted earnings per share of $1.52 in its September 10, 2015 Form 10-K. Thus, as a result of the false accounting in fiscal 2015, Defendant Will received 200% of his target bonus, or $650,000.

232. As disclosed by Celadon in a July 3, 2018 press release, the Company is being investigated by both the SEC and the Criminal Division of the United States Department of Justice ("DOJ") regarding the circumstances that led to the planned restatement. The Company has been cooperating with the investigations, including responding to subpoenas and meeting with investigators. The SEC and DOJ investigations along with the issuance of the restated financials will reveal the full extent of the misconduct that led to Celadon's need to issue such a massive restatement that will affect nearly every key financial metric.

## VI. CLASS ACTION ALLEGATIONS

233. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired CGI securities between October 29, 2013 through April 13, 2018, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

234. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CGI securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. As of November 14, 2016, the Company had 170,450,763 shares of common stock outstanding. Record owners and other

members of the Class may be identified from records maintained by CGI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

235. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of the Company's stock was artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

236. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

237. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

238. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. LOSS CAUSATION

239. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

240. During the Class Period, Plaintiffs and the Class purchased CGI securities at artificially inflated prices and were damaged thereby.

241. On October 12, 2016, a report published on the investor website *Seeking Alpha* entitled "Celadon Group: SEC Inquiries, Accounting Issues And Liquidity Constraints Point To 65% Near-Term Downside," identified major accounting irregularities related to Celadon's lease payment obligations and reserve liabilities.

242. In response, Celadon's stock fell almost 10% on unusually heavy trading with more than 1.9 million shares trading hands, dropping $0.84 per share to close at $7.80.

243. This decline is directly attributable to the October 12, 2016 *Seeking Alpha* article, which included, as a key focus, an analysis of Celadon's 2016 10-K that for the first time disclosed lease payment advances to Element, expressly contradicting Celadon's prior disclosures on the topic.

244. On April 5, 2017, a report published on the investor website *Seeking Alpha* entitled "Celadon Group: A Story that Ends At Chapter 11," detailed the "smoking gun" showing that CGI had falsified its financial statements and represented to shareholders that its investment in the Joint Venture was $100 million when, in fact, it was only $68.2 million due to a sham "daylight loan" the Company counted as a cash contribution to the Joint Venture.

245. On this news, shares of CGI fell from $6.25, the closing price on April 4, 2017, to close at $5.40 on April 5, 2017, on unusually heavy trading, representing a 13.63% decline in the value of the Company's common stock.

246. This decline is directly attributable to the April 5, 2017 article published by Prescience Point and featured on *Seeking Alpha* entitled "Celadon Group: A Story that Ends At Chapter 11," which detailed that a sham loan was counted by CGI, and reported to shareholders, as a capital contribution to the Joint Venture. As disclosed on April 2, 2018, these disclosures are the subject of Defendants' anticipated restatement. Further, the corrective impact of the revelations in the article was confirmed on April 5, 2017, by *Reuters*, who reported that "Celadon Group shares tumbled more than 20 percent after a short selling firm issued a report on the truckload freight company which said the stock was worth nothing."

247. On May 1, 2017, after trading had closed, CGI disclosed that its auditor had withdrawn its reports for the Company's financial statements for fiscal year 2016 (ended June 30, 2016) and the quarters ended September 30, 2016 and December 31, 2016, and that those financial statements should no longer be relied upon, and, additionally, that the Company's President and COO had resigned.

248. On this news, CGI's share price fell CGI fell from $4.00, the closing price on May 1, 2017, to $1.80 per share on May 2, 2017 on massive trading volume of 19.2 million shares, representing a 55% decline in the value of the Company's common stock.

249. This decline is directly attributable to the May 1, 2017 disclosure that the Company's financial statements should no longer be relied upon and that its President and COO had resigned.

250. On October 2, 2017, Celadon issued a press release in which the Company informed investors that the SEC had undertaken a formal investigation into the Company and that it had received a subpoena from the SEC and was in the process of producing documents to the SEC pursuant to the subpoena. Celadon also noted that it did not expect to issue audited financial statements or report financial results in compliance with GAAP for FY2016, or any subsequent period, before December 31, 2017.

251. On this news, Celadon's stock plummeted more than 11%, dropping $0.75 per share to close at $6.00.

252. The confirmation of an SEC investigation by Celadon is new, fraud-related information that is properly treated as corrective.

253. On April 2, 2018, Celadon disclosed that its internal investigation had "identified errors that will require adjustments to the previously issued 2014, 2015, 2016, and 2017 financial statements (and potentially periods prior thereto)."

254. In response, Celadon's stock cratered more than 60% on unusually heavy trading of almost 9.5 million shares, dropping $2.10 per share to close at $1.35 on April 4, 2018.

255. This decline is directly attributable to the April 2, 2018 disclosure that the Company's restatement would be expanded to cover several additional years as well as numerous previously undisclosed issues.

256. On April 13, 2018, CGI confirmed that it had received a delisting notice from the New York Stock Exchange indicating that the exchange had suspended trading prior to market open on April 3, 2018, and would be commencing procedures to delist the Company's stock because of CGI's inability to become current with its Securities and Exchange Commission

reporting obligations. On this news, CGI's stock fell more than 8.7% to close at $1.35 on April 16, 2018.

## VIII. FRAUD ON THE MARKET

257. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in efficient markets;

(d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

258. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## IX. NO SAFE HARBOR

259. The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

260. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## X. CAUSES OF ACTION

### COUNT I

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

261. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

262. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

263. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

264. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiffs

and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**

**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

265. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

266. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

267. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

268. As set forth above, CGI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct,

Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs' counsel as class counsel;

B. awarding compensatory and punitive damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## XII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

DATED: September 28, 2018

Respectfully submitted,

By: *s/ Carol C. Villegas*
**LABATON SUCHAROW LLP**
Carol C. Villegas
Alec T. Coquin
140 Broadway

New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
acoquin@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*

**BLOCK & LEVITON LLP**
Jason Leviton
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Email: jason@blockesq.com

*Additional Counsel for Lead Plaintiffs and the Class*